STUDENT PUBLIC INTEREST RE-
SEARCH GROUP OF NEW
JERSEY, INC., et al., Plaintiffs,

v.

AT & T BELL
LABORATORIES, Defendant.

Civ. A. No. 84–1087.

United States District Court,
D. New Jersey.

Aug. 13, 1985.

As Amended Aug. 30, 1985.

Terris & Sunderland by Bruce J. Terris, James M. Hecker, Washington, D.C., and Gordon & Gordon by Michael Gordon, West Orange, N.J., for plaintiffs.

AT & T Resource Management by John A. McKinney, Jr., Union, N.J., and Donovan, Leisure, Newton & Irvine, by Steven A. Tasher, Washington, D.C., for defendant.

## OPINION

STERN, District Judge.

This action is a citizen suit, brought under § 505 of the Water Pollution Control Act (FWPCA), as amended, 33 U.S.C. § 1365 (1982). Plaintiffs Student Public Interest Research Group of New Jersey, Inc. and Friends of the Earth seek a declaratory judgment, imposition of civil penalties and the award of costs, including attorney's and expert witness fees as a result of the defendant AT & T Bell Laboratories, Inc.'s (AT & T's) alleged violation of § 301(a) of the FWPCA, 33 U.S.C. § 1311(a) (1982), by numerous alleged violations of its National Pollutant Discharge Elimination System/New Jersey Pollutant Discharge Elimination System (NPDES/NJPDES) permit. This permit authorized defendant to discharge limited amounts of specified pollutants into the Whippany River.

Plaintiffs moved for partial summary judgment on the issue of defendant's liability for violation of the FWPCA. Defendant

cross-moved to dismiss, pursuant to Fed.R. Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. Defendant's motion is grounded in three arguments. First, defendant argues that the citizen suit provision of the Act does not permit plaintiffs to enforce a permit that is no longer in effect and to seek penalties for past violations of a permit no longer in effect. Second, defendant asserts that plaintiffs have no standing to bring suit because they have shown no injury caused by defendant's alleged violations, and their requested relief cannot remedy any alleged injury. Third, defendant argues that the New Jersey statute of limitations bars plaintiffs from asserting claims for violations occurring before March 26, 1982. Alternatively, defendant maintains that the federal statute of limitations, 28 U.S.C. § 2462 (1982) bars plaintiffs from asserting claims for violations occurring before March 26, 1979.

The Court heard oral argument on both motions on April 22, 1985. We now deny defendant's motion to dismiss and grant plaintiff's motion for partial summary judgment.

## FACTS

Defendant AT & T operates a research and development facility in Hanover Township, New Jersey. Some 3,000 scientists and support staff work at the 192-acre facility on telecommunications and electronics research, including specialized research for the United States Department of Defense. Prior to 1963, AT & T treated all of the facility's waste water through an on-site, conventional, biological waste treatment system. In that year, construction began on a new physical/chemical waste treatment plant to prepare waste water for discharge into the Whippany River.

On March 5, 1974, subsequent to the 1972 amendments to the FWPCA, the Environmental Protection Agency (EPA) issued a discharge permit for the AT & T facility, pursuant to § 402 of the Act, 33 U.S.C. § 1342 (1982). The permit set limits on the discharges of specified laboratory substances. It was modified to establish new limits in 1977, 1978 and 1979. In 1982, the authority to issue permits in New Jersey was transferred from the EPA to the New Jersey Department of Environmental Protection (NJDEP). On December 1, 1982, a NJDEP permit became effective for the AT & T facility. The limits set by the new permit were identical in all pertinent respects to those set by the 1979 renewal permit previously in force. On January 14, 1983, AT & T terminated its discharges into the Whippany River and diverted them to a treatment plant operated by the Hanover Sewerage Authority. The NJDEP removed its permit for the AT & T facility from its active files. There is no allegation before this Court of any subsequent discharge by defendant into the Whippany River.

Prior to the 1972 amendments to the FWPCA, federal water pollution laws sought to assure water quality standards reflecting the amount of pollution a given body of water could tolerate. This system of pollution control proved difficult to enforce because of the impracticality of attempting to impose precise effluent limitations for all pollutants based on water quality desired for receiving bodies of water. *See Federal Water Pollution Control Act Amendments of 1972*, S.Rep. No. 414, 92d Cong., 1st Sess., *reprinted in* 1972 U.S. Code Cong. & Ad.News 3668, 3672, 3675 (henceforth cited as S.Rep. No. 414). Consequently, the 1972 amendments were designed to control pollution through "effluent limitations" imposed on specific polluters for particular pollutants. S.Rep. No. 414, *reprinted in* 1972 U.S.Code Cong. & Ad.News, at 3675, 3709. The basic mechanism for enforcing the new statutory goal of controlling pollutant discharge is the NPDES permit system, created by § 402 of the FWPCA, 33 U.S.C. § 1342 (1982), which translates the general effluent limitations into specific obligations for each discharger. Absent such authorization, it is unlawful for anyone to discharge any pollutant in any amount. 33 U.S.C. § 1311(a) (1982).

Under the terms of the new law, the EPA Administrator issued permits on condition that recipients establish and maintain records, and install and maintain monitoring equipment to sample effluents, and report results to the EPA in the manner prescribed by the Administrator. 33 U.S.C. § 1318 (1982). Under the permits AT & T received, it was required to police itself by filing Discharge Monitoring Reports (DMRs) and Non-Compliance Reports (NCRs) with the EPA and the NJDEP. AT & T filed monthly DMRs from July 1977 through June 1979 and semi-annual DMRs from July 1979 through December 1982. AT & T also submitted several NCRs in this five-year period in the form of letters to EPA and NJDEP reporting failures to comply with permit limitations on daily maximum effluent discharges.

Plaintiffs seek partial summary judgment on defendant's liability for eighty-seven specific permit violations between 1977 and 1982. The number of alleged violations exceeds the number of violations AT & T reported to state and federal authorities because of three flaws in AT & T's methods that led to underreporting of violations. First, AT & T's permit allowed semi-annual reports after June 1979 but did not exempt AT & T from monthly monitoring of discharges and meeting effluent limitations based on monthly monitoring. Instead of reporting each monthly violation, AT & T averaged the discharges by adding them up for each six-month period and dividing by six. Only if the semi-annual average violated the limitation was it reported. Plaintiffs recomputed the monthly averages by examining the laboratory reports underlying the DMRs. Brief for Plaintiffs in Support of Motion for Partial Summary Judgment, *Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories,* No. 84–1087, at 15 (D.N.J.1985). Secondly, AT & T also underreported the maximum discharge violations after June 1979. Instead of reporting each monthly violation of discharge limitations, AT & T reported only the most serious violation for each six-month period. Again, plaintiffs have

reworked test figures underlying the DMRs to compute the actual number of violations. *Id.* at 15–16.

Third, AT & T underreported violations of both the average and the maximum limitations between April and June 1982 when test samples were split and sent to two different labs, both chosen by AT & T— Chemtech Consulting Group and Princeton Testing Laboratories. AT & T did not consistently choose one lab's results over the other's in preparing DMRs. Eight of plaintiffs' eighty-seven alleged violations are ones where both labs reported discharges exceeding limitations, or where only one lab did, but AT & T reported that result in the DMR. Plaintiffs are not disputing situations where only one lab reported violative discharges and AT & T reported the other lab's results or neither lab's results. *Id.* at 16–18.

Although defendant has submitted many exhibits, including an affidavit that discusses discharge testing in some detail by Paul E. Wyszkowski, who has "general supervisory authority over all matters impacting the environment as a result of the operations of A.T. & T. Bell Laboratories," nowhere does defendant contest these three alleged flaws in reporting methods.

## DISCUSSION

*A. Defendant's Motion to Dismiss*

Although plaintiff's motion was filed first in time, we treat defendant's motion first since it raises questions that are logically antecedent: whether plaintiffs have stated a claim upon which relief can be granted, whether plaintiffs have standing, and whether plaintiffs claims are time-barred.

Defendant offers the threshold argument that one of the plaintiffs, Friends of the Earth (FOE), should be precluded from participation in this suit because it failed to give sixty days notice of intent to sue as required by § 505(b)(1) of the FWPCA, 33 U.S.C. § 1365(b)(1)(A) (1982). The defendant acknowledges that

plaintiff Student Public Interest Research Group of New Jersey, Inc. (SPIRG) served its notice of intent to sue on defendant on March 4, 1983. We hold that the failure of one plaintiff to file notice of intent to sue does not deprive this Court of subject matter jurisdiction over the action, considering that over thirteen months elapsed after SPIRG filed notice before a hearing was held. *See Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton,* 644 F.2d 995, 996–97 (3d Cir.1981) (citing passage of eleven months before hearing in rejecting a similar motion). We hold further that because one plaintiff served adequate notice, both plaintiffs "substantially complied" with the statutory requirements, and defendant's right to adequate notice was preserved. *Student Public Interest Research Group of New Jersey, Inc. v. Tenneco Polymers, Inc.,* 602 F.Supp 1394, 1396 (D.N.J.1985); *see South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118, 123–24 (D.S.C.1978).

### 1. Claims of Past Violations of Expired Permits

Defendant draws attention to the statutory authorization of citizen suits in § 505(a)(1) to maintain that such actions are limited to present permit holders for the purpose of halting pollution:

> ... [A]ny citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be *in violation* of ... an effluent standard or limitation under this chapter.....

33 U.S.C. § 1365(a)(1) (1982) (emphasis added). Does the use of the present tense, "in violation", mean that past violations are immunized from citizen suit enforcement? Defendant also draws attention to the statutory definition of "effluent standard or limitation" in § 505(f)(6) of the Act in order to argue that citizen suits are limited to enforcement of permits that are currently in effect when the suit is filed:

> (6) a permit or condition thereof issued under section 1342 of this Title, which is *in effect* under this chapter....

33 U.S.C. § 1365(f)(6) (1982) (emphasis added). Does "in effect" mean at the time of the complaint or at the time of the violation? In claiming that past violations are immunized, and that actions are maintainable only against violations of permits in effect at the time of the complaint, defendants conclude that § 505 citizen suits may be brought only to abate violations that are ongoing at the commencement of the action.

The obvious difficulty with this interpretation is that, for administrative and procedural reasons we have already alluded to, a court could not possibly consider a citizen suit alleging violations of the FWPCA until months after those violations occurred. If the violations were of limitations in permits, the monitoring system requires that discharge samples be sent to laboratories for processing and analysis. Reports of these tests then become the basis of DMRs and NCRs submitted by the permittee to the EPA and state agencies where a citizen group might gain access to them. Before filing suit, however, 33 U.S.C. § 1365(b)(1)(A) (1982) requires sixty days notice to the permittee and the agencies. Whatever Congress meant by using the present tense in §§ 1365(a)(1) and (f)(6), therefore, Congress could not conceivably have meant that the violations literally be ones occurring at the time the citizen suit is filed.

The most significant legal support for defendant's interpretation is a very recent Fifth Circuit opinion that came to this Court's attention only after the hearing on the present motions. In *Hamker v. Diamond Shamrock Chemical Co.,* 756 F.2d 392 (5th Cir.1985), the court considered a § 505 citizen suit brought by property owners against the owners of an oil pipeline. In January of 1983, the pipeline leaked into a creek that flowed onto the plaintiffs' property. Before the leak was detected and the flow of oil shut down, approximately 2,400 barrels of crude oil were discharged into the creek. *Id.* at 394. Among the relief sought by plaintiffs' suit was a claim for civil penalties pursuant to 33 U.S.C. § 1319(d) (1982). Among the de-

fenses was a claim similar to defendant's in the present case that the court lacked subject matter jurisdiction because § 505 authorizes only prospective relief, which is inappropriate where defendant no longer discharges, and because the statute does not permit citizen suits for past violations. The district court dismissed, and the Fifth Circuit affirmed based on "[t]he language of section 1365 and the structure of the Act." *Id.* at 395. Specifically, the court noted that § 505 authorized citizen suits against defendants "alleged to be in violation" of effluent limitations. *Id.* (citing 33 U.S.C. § 1365(a)(1) (1982)). Secondly, the court found that although the EPA "may have the power to seek some redress for past violations," the EPA's role in the statutory enforcement scheme is more "central" than that of citizen suits, and § 1365(a) "obviously does not permit the citizen to *duplicate* the Administrator's powers." *Id.* The centrality of EPA and state agency enforcement is implicit, the court held, in the notice provision of § 1365(b)(1)(A), which was intended to allow officials to pre-empt the citizen suit by bringing suit first, or else to allow the violator to stop violating and thereby escape liability. *Id.* at 395–96.

Finally, the court found support in *Middlesex County Sewerage Authority v. National Sea Clammers*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and in particular in a statement, quoted in that opinion, by Senator Hart:

It has been argued, however, that conferring additional rights on the citizen may burden the courts unduly. I would argue that the citizen suit provision of S. 4358 has been carefully drafted to prevent this consequence from arising. First of all, it should be noted that the bill makes no provision for damages to the individual. It therefore provides no incentives to suit other than to protect the health and welfare of those suing and others similarly situated. It will be the rare, rather than the ordinary, person, I suspect, who, with no hope of financial gain and the very real prospect of financial loss, will initiate court action under this bill.

*Hamker*, 756 F.2d at 396 (quoting *Middlesex*, 453 U.S. at 18 n. 27, 101 S.Ct. at 2625 n. 27 (quoting 116 Cong. Rec. 33104 (1970))).[1]

We respectfully disagree with the Fifth Circuit and with defendant in the present case. The Fifth Circuit found no need to refer to legislative history because it felt that the statutory language was clear. *Id.* at 395. We submit that legislative history must be considered because the sheer number of court decisions holding that citizen suits may seek civil penalties for past violations shows that the language is not clear. Judge Gerry recently held: "A plausible construction of the language is that one is 'in violation,' and continues to be 'in violation' by having 'violated.' In other words, the taint of a past violation is continuing." *Student Public Interest Research Group of New Jersey v. Monsanto Co.*, 600 F.Supp. 1474, 1476 (D.N.J.1985) (henceforth cited as *Monsanto II*). It would not be odd locution to say someone is "in violation" of the tax laws even though he or she filed the fraudulent return two or three years ago, or "in violation" of election laws for failing to report campaign contributions received for a past campaign. Similarly, a polluter might be "in violation" of the FWPCA for violations of two or three years ago. Other courts have recently read the statute the way the *Monsanto II* court did. *See Sierra Club v. Aluminum Co. of America*, 585 F.Supp. 842, 853–54 (N.D.N.Y.1984); *Student Public Interest Research Group of New Jersey v. Anchor Thread Co.*, 5 P.C.G. (CCH) ¶¶ 40,565, 40,617 (D.N.J.1984) (henceforth cited as *Anchor Thread*); *Student Public Interest Research Group of New Jersey v. Ragen Precision Industries*, No.

---

1. The Fifth Circuit does not note that Senator Hart was actually referring to the Clean Air Act, not the FWPCA. The Supreme Court quoted the passage in a discussion about the FWPCA because its citizen suit provision was modeled on that of the Clean Air Act. *Middlesex*, 453 U.S. at 17–18 n. 27, 101 S.Ct. at 2624–2625 n. 27. The Fifth Circuit errs stating that Hart was referring to "section 1365 suits" and in stating that Hart was a "sponsor". *Hamker*, 756 F.2d at 396.

83–1604, Tr. of Dec. 19, 1983, at 7 (D.N.J.) ("I think the Federal Water Pollution Control Act provides for citizen suits based solely on past violations"). Congress apparently used the phrase "in violation" because use of the past tense might have created the implication that citizens suits could not seek injunctive relief.

The same conflicts of interpretation have arisen over the definition of effluent limitation in 33 U.S.C. § 1365(f)(6) (1982), which provides that the permit containing the limitation be "in effect under this chapter."[2] Given the sixty-day notice requirement, and the relative ease with which a permit can be renegotiated, defendant's view that "in effect" means at the time of the initiation of suit would virtually destroy the effectiveness of citizen suits, because polluters could escape liability by negotiating a new permit after receiving notice of a citizen suit. If the permit was near expiration, a violator would automatically escape. In choosing to believe that "in effect" must mean at the time of violation, the *Alcoa* court had this consequence of defendant's view in mind:

> First, to accept Alcoa's position, a company would never be liable for violations occurring immediately preceding expiration of a permit, since by the time a plaintiff gave notice and filed a suit the company would have a new permit. Second, the purpose behind the statute's provision for civil penalties would be frustrated by Alcoa's position. To the extent the Act seeks to deter violations, permitting a defendant to avoid liability for past violations works a substantial diminution of any deterrent effect.

*Alcoa*, 585 F.Supp. at 853–54. *See also Ragen*, Tr. at 3, 7.

No matter which interpretation of the "in violation" and "in effect" phrases seems more probable, we ought to at least admit that the language is sufficiently troublesome that consultation of the legislative history is warranted. If we do this, we discover, first of all, that Senator Muskie, the principal sponsor in the Senate of the FWPCA amendments, assumed that Congress intended to authorize citizen suits based on past violations even if not continuous up to the time a suit is filed. Speaking for the Conference Committee of both houses, Muskie remarked:

> Citizen suits can be brought to enforce against both continuous and intermittent violations.
>
> \*    \*    \*    \*    \*    \*
>
> The Conferees [in the Conference Committee] accepted a provision requiring that citizens seeking to bring an action give appropriate notice and wait 60 days before filing suit and to give the appropriate agencies a chance to act.
>
> This 60-day [notice] provision was not intended, however, to cut off the right of action a citizen may have to violations that took place 60 days earlier but which may not have been continuous. As in the original Senate bill, a citizen has the right under section 505 to bring an action for an appropriate remedy in the case of any person who is alleged to be, *or to have been, in violation, whether the violation be a continuous one, or an occasional or sporadic one.*

(emphasis added) 118 Cong.Rec. 33693, 33700 (report of Conference Committee on S. 2770) (emphasis added), *reprinted in* Congressional Research Service, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendment of 1972, 163, 179 (Comm. Print) (henceforth cited as Legis. Hist.). Note that Muskie's understanding is in direct conflict with the Fifth Circuit's view that the sixty-day notice provision was intended to give the alleged violator an opportunity to respond "to the notice by bringing himself into compliance, [whereupon] the citizen loses the right to bring suit under 1365(a)...." *Hamker*, 756 F.2d at 396.

The legislative history also raises serious doubts about the Fifth Circuit's view that the enforcement role of the EPA Adminis-

---

**2.** This language was not an issue in *Hamker*.

trator is "central", while that of citizen suits is merely supplemental. *Id.* at 395. As we discuss below, Congress did assume that state agencies would undertake most enforcements. It is also true that the sixty-day notice period of § 1365(b)(1)(A) allows pre-emption by the EPA or state agency. But it does not follow that the scope of enforcement and the remedies available are sharply reduced for citizen suits. Such a conclusion is necessary for the Fifth Circuit's decision because there is no doubt that the EPA may bring suit based on past violations. *See United States v. Earth Sciences, Inc.,* 599 F.2d 368, 375–76 (10th Cir.1979). The legislative history shows, however, that there was great concern in Congress that the varied enforcement mechanisms be uniform. Citizen suits had to be strong because government bodies are, the Senate Report recognized, major polluters.

It is the [Public Works] Committee's intent that enforcement of these control provisions be immediate, that citizens should be unconstrained to bring these actions, and that the courts should not hesitate to consider them.

Section 505 would provide that a citizen enforcement action might be brought against an individual or a government agency. As recognized under section 313 of the bill, Federal facilities generate considerable water pollution. Since some Federal agencies such as the Department of Defense have failed in abating pollution and in requesting appropriations to develop control measures, it is important to provide that citizens can seek, through the courts, to expedite the government performance specifically directed under section 313.

S.Rep. No. 414, *reprinted in* 1972 U.S. Code Cong. & Ad.News, at 3746 (from a section entitled "Discussion of Intent").

It was important, the Senate Report continued, to avoid inconsistencies in policy that might result from uneven enforcement efforts:

The standards for which enforcement would be sought either under adminis-

*trative enforcement or through citizen enforcement procedures are the same.* Therefore the participation of citizens in the courts seeking enforcement of water pollution control requirements should not result in inconsistent policy.

*Id.* (emphasis added). Consistent policy was essential. State governments have a strong incentive to shirk their responsibility to combat pollution because they compete for industries deciding where to locate and they strive to keep existing industries from moving away. Congress envisioned that state agencies would handle most enforcement measures. *See, e.g.,* 33 U.S.C. §§ 1251(b) (1982); 1319(a)(1), (2), (3) (1982); S.Rep. No. 414, 1972 U.S.Code Cong. & Ad.News, at 3747; Legis. Hist. at 355 (remarks of Congressman Blatnik). But the states alone would not enforce a nationally uniform policy. As Governor Anderson of Minnesota explained:

I suggest that there is one insight which should be shared with you. I suggest that every Governor in the country knows what is the greatest political barrier to effective pollution control. It is the threat of our worst polluters to move their factories out of any State that seriously tries to protect its environment. It is the practice of playing off one State against the other. It is the false but strident cry of the polluter that clean air and water mean fewer jobs.

Every Governor in this country knows that when he tries to put some teeth into his State's anti-pollution laws, his efforts will be met by precisely these sort of threats.

My message to you today is this: the answer to threats is uniformity. The only way to stop polluters from political intimidation is to prevent them from raising the alternative of moving to a place where pollution is allowed. There should be no such place in this country. We can no longer tolerate the fact that the price of diligence is intimidation. We should have uniform standards of pollution control in all fifty States—tough standards, fair standards, a set of meaningful and comprehensive rules that permit neither

exception nor evasion. Pollution does not stop at State boundaries and neither must its regulation.

Legis. Hist. at 452 (Congressman Reuss reading and concurring with the testimony of Governor Wendell R. Anderson), *see also id.* at 356 (Congressman Blatnik's view that FWPCA "will not allow the industrial equivalent of forum shopping").

The D.C. Circuit Court of Appeals has stressed that it was the "plainly expressed purpose of Congress to require nationally uniform interim limitations upon the sources of pollution" in order to prevent competition among states for industry, avoid an inundation of litigation in the courts, and effectively eliminate pollution. *American Frozen Food Institute v. Train,* 539 F.2d 107, 129 (D.C.Cir.1976). The Court quoted remarks by Senator Muskie to underline "[t]he critical importance of 'nationally uniform effluent limitations.'" *Id.* at 118.

The view of defendants and of the Fifth Circuit in *Hamker* would undermine the clear congressional purpose of making citizen suits effective and of ensuring uniformity in enforcement efforts. Congress counted on citizen suits to protect against the omnipresent danger of a state shirking its enforcement responsibilities. But citizen suits confined to prospective relief for ongoing violations could not fill this role.

The structure of the citizen suit provision itself also undermines the theory that such suits were intended to be peripheral. The provision reads:

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) agaisnt the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

33 U.S.C. § 1365(a) (1982). In authorizing civil penalties, the provision cross-references § 1319(d), which provides for a civil penalty not to exceed $10,000 per day of violation against "[a]ny person who violates ... *any* permit condition...." (emphasis added). It is undisputed that the EPA may seek civil penalties under § 1319(d) for past violations. The citizen suit provision simply refers to the same section that empowers the EPA. There is no suggestion in the statute that the EPA's authority to seek civil penalties is radically greater than citizens' because citizen suits are limited to prospective relief. Yet the theory of defendants and of the *Hamker* court would require us to believe that § 1319(b) has two radically different interpretations, one for citizen suits and one for EPA suits.

The whole idea that Congress might have empowered citizens to seek civil penalties only prospectively is rather odd. Penalties are necessarily imposed on past violations. Presumably, defendants and the *Hamker* court envision the possibility of a court imposing civil penalties on a permittee that ignores the citizen suit, despite sixty days notice, and continues to discharge pollutants in excess of permit limitations. If so, however, citizen suits would not only be impotent, there would be no need to provide civil penalties. Citizen suits can certainly seek injunctive relief. The courts are fully empowered to impose sanctions for contempt, sanctions greater than those available under § 1319(d). Thus, the theory of defendants and of the *Hamker* court

would require us to believe that the provision empowering courts to enforce citizen suits with civil penalties was superfluous.

The principal case cited in support of the restrictive view of FWPCA citizen suits is *Middlesex. See Hamker*, 756 F.2d at 396. The issue of whether citizen suits may seek civil penalties for past violations was not before the *Middlesex* court. The case involved a claim by the plaintiff organization that, in addition to the general citizen suit provision, it had an implied private right of action for damages. *Middlesex*, 453 U.S. at 6, 9, 101 S.Ct. at 2619, 2621. In setting forth the history of the case, the Court explained that the FWPCA citizen suit provision does not explicitly authorize damage remedies: "This provision allows suits under the Act by private citizens, but authorizes only prospective relief, and the citizen plaintiffs first must give notice to the EPA, the State, any alleged violator." *Id.* at 6, 101 S.Ct. at 2619. The Court went on to hold that no damage remedy was available, *id.* at 18, 101 S.Ct. at 2625 (citing with approval *Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008 (7th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980)), because Congress did not intend to provide an implied private right of action, *id.* 453 U.S. at 13–18, 101 S.Ct. at 2622–2625. The Court did not question that citizen suits could seek civil penalties payable to the federal government. *See id.* at 14 n. 25, 101 S.Ct. at 2623 n. 25. We do not believe the Court intended to preclude civil penalties based on past violations.

We have seen that Congress intended to provide uniformity in the enforcement mechanisms of the FWPCA. The Supreme Court's rejection of an implied private right of action under the FWPCA *furthered* the goal of uniformity in EPA, state and citizen suit enforcement, but to hold that citizen suits alone are barred from seeking civil penalties for past violations would *thwart* the goal of uniformity in enforcement.

There is no suggestion anywhere in the *Middlesex* decision that the Court intended this result. On the contrary, the Court remarked that many citizens seeking to enforce the FWPCA would do so without economic injury and "as private attorneys general," suggesting that Congress intended citizens to step into the shoes of government agencies that failed to act.[3] *Id.* at 17, 101 S.Ct. at 2625.

The *Middlesex* Court cited Senator Hart's view that damages were not available under the Clean Air Act because the FWPCA citizen suit provision was modeled on that of the Clean Air Act. *Id.* at 17–18, n. 27, 101 S.Ct. at 2624–25, n. 27; *see supra* n. 1. But there is no suggestion that citizens could not seek civil penalties payable to the federal government. Hart's point was that, absent the financial incentive offered by the availability of damages, there was no danger of a flood of citizen suits clogging the courts. Hart's remarks have no relevance to whether civil penalties are available based on past violations under the FWPCA because civil penalties offer no financial incentive to citizens.

■ We conclude that Congress did not intend to confine citizen suits to civil penalties for present violations, and that plaintiffs may bring this action against past violations of expired permits. We agree with the courts that have construed the "in violation" phrase of § 1365(a)(1) to include continuing and interrupted violations and the "in effect" phrase of § 1365(f)(6) to mean "in effect at the time of the violation." *See Illinois v. Outboard Marine Corp., Inc.*, 680 F.2d 473, 480–81 (7th Cir. 1982) (holding that defendant's acquisition of a new NPDES permit after the violations named in the complaint brought under FWPCA "does not materially change the situation before us").

### 2. Plaintiff's Standing

■ Defendant maintains that plaintiffs lack standing both because they fail to

---

**3.** *Compare* the *Hamker* court's view that § 1365(a) "obviously does not permit the citizen

to *duplicate* the Administrator's powers."

identify members who are adversely affected or injured by AT & T's violations and because a favorable decision by this court could not redress any injury alleged by plaintiffs. The first of these grounds evaporated when plaintiffs submitted eight affidavits by individual members of their organizations who live near bodies of water affected by AT & T's discharges. These members claim injuries in the form of preclusion from using those bodies of water for fishing and recreation, of having to look at ugly waterways, and of having to drink bottled water because of pollution in water supplies. Under *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), "injury" for standing purposes need not be economic; it can be injury to aesthetic, recreational or environmental values. *Id.* at 735, 92 S.Ct. at 1366. *See also Middlesex,* 453 U.S. at 16–17, 101 S.Ct. at 2624–25 (1981); *Tenneco Polymers,* 602 F.Supp. at 1396–97.

■ A second requirement for standing is "that the injury 'fairly can be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). The AT & T facility no longer discharges pollutants into waterways and no longer holds a permit, so plaintiffs do not expect to deter future misconduct by AT & T. Since plaintiffs seek civil penalties, only the United States Treasury can receive financial redress for past violations. S.Rep. No. 414, *reprinted in* 1972 U.S.Code Cong. & Ad.News, at 3745. Plaintiffs cannot show that these funds will be used to improve conditions in bodies of water affected by AT & T's discharges. How then will plaintiffs' injuries be redressed by the relief they seek?

We believe plaintiffs' members will benefit personally from the relief they seek. We note, however, that an exacting and personalized showing of redressability is neither appropriate nor necessary in a case of this type. Plaintiffs are the beneficiaries of a legislative grant of standing in § 505 of the FWPCA, 33 U.S.C. § 1365 (1982). They have met the minimal Article III showing of "a distinct and palpable injury" to themselves, *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), therefore:

... [S]o long as this [Article III] requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of legal rights and interests of others, and may invoke the general public interest in support of their claim.

*Id.* (citations omitted).

We hold that plaintiffs have standing to sue because the general public interest will benefit.

First, this Court does not concede that imposition of civil penalties on AT & T will serve no specific deterrence function. The fact that AT & T has stopped discharging into waterways is not an inviolate commitment. Nothing prevents AT & T from once again applying for a permit for its Hanover Township facility and recommencing its discharges into the Whippany River. Since this possibility cannot be dismissed, it serves the purposes of the FWPCA for AT & T to know that it cannot escape liability for permit violations merely by again halting its discharges.

But it is not only AT & T that will be affected by civil penalties imposed on AT & T. Plaintiff's suit will deter *other* polluters of the same waterways into which AT & T formerly discharged pollutants. Other polluters will have greater incentive to comply quickly with effluent limitations in their permits, rather than wait, if they know they can be sued for past violations even if they cease discharges or come into compliance with their permits before they are sued.

Credible as this theory of general deterrence may be, it admits a disjunction between the injuries plaintiffs complained of (which were casued by AT & T) and the injuries plaintiffs seek to deter (which are

caused by other polluters). The question becomes: Would this Court's relief "redress" plaintiffs' injuries if its only effect is to deter those who cause other injuries of the same type to the same plaintiffs and to the general public? We hold that the answer to this question is "yes". There is little doubt that Congress intended deterrence as a purpose of sanctions under the FWPCA. This includes both general and specific deterrence. The EPA has stressed these points in its policy statement on enforcement of civil penalties:

> The first goal of penalty assessment is to deter people from violating the law. Specifically, the penalty should persuade the violator to take precautions against falling into noncompliance again (specific deterrence). Successful deterrence is important because it provides the best protection for the environment. In addition, it reduces the resources necessary to administer the laws by addressing noncompliance before it occurs.

> If a penalty is to achieve deterrence, both the violator and the general public must be convinced that the penalty places the violator in a worse position than those who have complied in a timely fashion. Neither the violator nor the general public is likely to believe this if the violator is able to retain an overall advantage from noncompliance. Moreover, allowing a violator to benefit from noncompliance punishes those who have complied by placing them at a competitive disadvantage. This creates a disincentive for compliance. For these reasons, it is Agency policy that penalties generally should, *at a minimum*, remove any significant economic benefits resulting from failure to comply with the law. This amount will be referred to as the "benefit component" of the penalty.

> \* \* \* \* \* \*

> In some classes of cases, the normal gravity calculation may be insufficient to effect general deterrence. This could happen if, for example, there was extensive noncompliance with certain regulatory programs in specific areas of the United States. This would demonstrate that the normal penalty assessments had not been achieving general deterrence. In such cases, the case development team should consider increasing the gravity component sufficient to achieve general deterrence. These extra assessments should balance the other goals of this policy, particularly equitable treatment of the regulated community.

United States Environmental Protection Agency, *Policy on Civil Penalties, EPA General Enforcement Policy GM–21* (Feb. 16, 1984).[4] The fact that AT & T no longer discharges should not allow it "to retain an overall advantage" from years of noncompliance. To do so would create a disincentive to compliance for all polluters. We have already seen that Congress intended no difference between the standards of enforcement of citizen suits and EPA suits. S.Rep. No. 414, *reprinted in* 1972 U.S. Code Cong. & Ad.News, at 3746. Unless foreclosed by statutory language, the EPA's interpretation of the FWPCA "is entitled to considerable deference" and a court "should defer to that view unless the legislative history or the purpose and structure of the statute clearly reveal a contrary intent on the part of Congress." *Chemical Manufacturers Association v. Natural Resources Defense Council, Inc.,* — U.S. ——, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985). The EPA policy clearly envisions "increasing the gravity component" of the penalty against a particular polluter in order to effect the goals of general deterrence. Thus, it is consistent with Congress' intent to allow plaintiffs in citizen suits to redress their injuries by seeking relief in the form of general deterrence.

**4.** *See also* United States Environmental Protection Agency, *Agencywide Compliance and Enforcement Strategy and Strategy Framework for EPA Compliance Programs* 26 (May 1984) ("civil penalty actions are often necessary even if the underlying violation has been corrected, to deter future violations, and to restore economic equity to other regulated parties which have invested the resources needed to be in compliance all along.")

This remedial approach is compatible with the refusal both of Congress to require plaintiffs under the FWPCA to isolate and define the injury from a particular polluter in order to show a violation, and of the courts to isolate a specific injury by a polluter in order to show Article III standing based on injury in fact. Such requirements would defeat the purpose of the FWPCA and other pollution-control laws. In general, numerous polluters contribute to an environmental harm like the pollution of rivers. It is not possible to divide up the general harm and allocate shares to particular polluters. This was why Congress enacted the 1972 amendments to the FWPCA that abandoned permit limits based on the impact of discharges on water quality and adopted permit limits based on technological controls on polluting facilities. S.Rep. No. 414, *reprinted in* 1972 U.S.Code Cong. & Ad.News, at 3765 ("Water quality standards ... often cannot be translated into effluent limitations, defendable in court tests."). Similarly, the *Tenneco Polymers* Court properly rejected a permittee's claim that FWPCA citizen suit plaintiffs lacked standing because they claimed injury from the general pollution of the Delaware River but could show no specific injuries caused by the defendant. *Tenneco Polymers,* 602 F.Supp. at 1397 ("The effect of the defendant's argument would be to prohibit any citizens' suits against violators of the FWPCA unless the violation was so great or the waterway so small that the direct impact of the discharges could be pinpointed."). Thus, in defining violations Congress has recognized the generalized nature of pollution injury, and courts have done the same in considering the injury in fact requirement for standing. It is, therefore, appropriate that general deterrence is a major goal of remedies under the FWPCA.

Defendant urges us to consider *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) because the Court found plaintiffs lacked standing because they had showed "little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and improve were the court to grant relief." *Id.* at 507, 95 S.Ct. at 2209. But the deterrent effect of civil penalties is not a remote possibility. Therefore, plaintiffs' members and the general public will benefit sufficiently from the remedy sought by this suit to support their standing to sue.

### 3. Statutes of Limitations

■ Defendant moves to dismiss claims for violations occurring before March 26, 1982, because this Court should apply the two-year statute of limitations on forfeiture claims recoverable only by the sovereign. N.J.Stat.Ann. § 2A:14–10(a) (West 1952). Seventy of the eighty-seven alleged violations occurred before March 26, 1982. Leaving aside the question of whether defendant has identified the most analogous statute of limitations, we hold that no state statute of limitations applies to citizen suit actions under the FWPCA. It is clear that if the EPA brought this suit no state statute of limitations should be borrowed. *United States v. Summerlin,* 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *United States v. Podell,* 572 F.2d 31, 35 (2d Cir.1978). We have seen already that Congress sought to promote regulatory uniformity by providing identical enforcement mechanisms for citizen and governmental suits under the FWPCA. The major purpose of the policy favoring uniformity is to prevent states from trying to outbid their neighbors for industries and jobs by maintaining lower pollution standards. State standards need not be identical to federal ones; states may institute *stricter* controls. 33 U.S.C. § 1313 (1982). Defendant urges this Court to believe that Congress wanted uniformity in the "substantive" standards for water pollution control but was prepared to let the states go their own ways on "procedural" statutes of limitations. The distinction between permissible and impermissible deviations from FWPCA standards, however, has nothing to do with the distinction between substance and procedure. The distinction is based instead on Congress' un-

derlying policy objectives. *Compare Kentucky v. Train,* 9 E.R.C. 1280 (E.D.Ky. 1976) (overturning state standard below that required by FWPCA) *with Homestake Mining Co. v. United States Environmental Protection Agency,* 477 F.Supp. 1279, 1284–85 (D.S.D.1979) (upholding state standard stricter than one in FWPCA). Uniformity means identical minimum standards because the purpose is to remove the states' incentive to favor business through environmental regulation. *See* § 1 *supra* (discussing congressional intent of uniform policy); *Tenneco Polymers,* 602 F.Supp. at 1398–99 (refusing to borrow same statute of limitation defendant urges upon this Court). Federal courts are bound not to apply state statutes of limitations where the result would be to frustrate the implementation of national policies. *Knoll v. Springfield Township School District,* 699 F.2d 137, 141 (3d Cir.1983).

■ Defendant argues in the alternative that this Court should dismiss eighteen out of the eighty-seven permit violations because they occurred prior to March 26, 1979. Defendant maintains that the five-year federal statute of limitations, 28 U.S.C. § 2462 (1982) applies to this case. At least one court has applied this statute in a § 505 citizen suit. *See Friends of the Earth v. Facet Enterprises, Inc.,* No. 84–0357, Tr. of Dec. 28, 1984, at 7 (W.D.N.Y.). This exception aside, there is a dearth of authority for applying the federal five-year limit to either citizen suits or EPA actions.[5]

We believe that the same logic that precludes application of the state statute of limitations to citizen suits also precludes application of the federal five-year limit. It is national policy that the primary responsibility and primary right to reduce and eliminate pollution belongs to the states. 33 U.S.C. §§ 1251(b), 1319(a)(1), (2) (1982). EPA and citizen suit actions are intended as supplements to state enforcement in case the states fail to enforce NPDES permits. 33 U.S.C. § 1319(a)(1), (2), (3) (1982); S.Rep. No. 414, *reprinted in* 1972 U.S. Code Cong. & Ad.News, at 3747. Actions brought by NJDEP to enforce NPDES/NJPDES permits under the state Water Pollution Control Act, N.J.Stat.Ann. § 58:10A–10 (West 1982), are not subject to a statute of limitations. If the five-year federal statute of limitations were applied to citizen suits, therefore, they would be hampered in a way state efforts are not, and the clear policy favoring uniformity in enforcement would be thwarted. The absence of any definitive authority for applying the federal statute of limitations to § 505 citizen suits, *see Anchor Thread,* ¶ 40,565; *Tenneco Polymers,* 602 F.Supp. at 1399 combined with the definite conflict such an application has with congressional policy, compels us to rule that 28 U.S.C. § 2462 does not apply to the present case.

Accordingly, defendant's motion to dismiss is denied in its entirety.

### B. *Plaintiffs' Motion for Partial Summary Judgment*

■ Plaintiffs seek summary judgment on the issue of liability in the form of a declaratory judgment that defendant has violated §§ 301, 402 of the FWPCA. Violations of NPDES permits are treated as automatic violations of the FWPCA. *See United States v. Velsicol Chemical Corp.,* 438 F.Supp. 945, 949 (W.D.Tenn.1976).

■ It is well-settled that intent and good faith are irrelevant to the question of civil liability for violations of the FWPCA. *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir.1979); *Student Public Interest Research Group of New Jersey v. Monsanto Co.,* 600 F.Supp. 1479, 1485 (D.N.J.1985) (henceforth cited as *Monsanto I* ). Willful or negligent violations are separately punishable by criminal penalties under 33 U.S.C. § 1319(c)(1) (1982). *Id., United States v. Frezzo Brothers, Inc.,* 17 E.R.C. 2037, 2043–44 (E.D.Pa.1982).

---

**5.** Defendants cite *United States v. C & R Trucking Co.,* 537 F.Supp. 1080, 1083 (N.D.W.Va.1982) for application of the five-year federal statute to an action brought by the United States, but the *C & R Trucking* court merely held that the complaint was *not* barred because the violation occurred less than five years before the suit was instituted.

Civil suits under the FWPCA are, however, well-suited for summary judgment. *Earth Sciences*, 599 F.2d at 374; *Monsanto I*, 600 F.Supp. at 1485. The legislative history supports this view: "Enforcement of violations of this Act should be based on a minimum of discretionary decisionmaking or delay." S.Rep. No. 414, *reprinted in* 1972 U.S.Code Cong. & Ad.News, at 3730.

A line of recent cases has held that DMRs and NCRs are adequate to establish liability under the FWPCA. *Student Public Interest Research Group of New Jersey v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1538–30 (D.N.J.1984) (henceforth *Fritzsche, Dodge* ), *aff'd*, 759 F.2d 1131 (3d Cir.1985); *Anchor Thread*, 5 P.C.G. (CCH) ¶ 40,565 (D.N.J.1984); *Tenneco Polymers*, 602 F.Supp. at 1400; *Monsanto I*, 600 F.Supp. at 1485. Defendant seeks to distinguish these cases on the ground that defendants in them either offered no evidence of the inaccuracy of DMRs and NCRs or else argued their inaccuracy unconvincingly or without sufficient specificity.

To hold that DMRs and NCRs are adequate to establish liability does not mean they are conclusive proof. The EPA regulations allow permittees to raise certain affirmative defenses such as upset[6] and bypass.[7] Summary judgment is also inappropriate if there are genuine issues of material fact. Fed.R.Civ.P. 56(e). In *Fritzsche, Dodge*, for example, this Court considered interrogatory responses and an EPA exhibit submitted to support defendant's claim of inaccuracies in the DMRs. 579 F.Supp. at 1538 (holding this evidence unconvincing). Similarly the *Tenneco Polymers* court considered defendant's affidavits. 602 F.Supp. at 1400 (finding the affidavits "insufficient to raise a question

of fact to defeat the plaintiffs' motion for summary judgment").

■ In the present case, defendant has raised the affirmative defense of upset with respect to seven of the eighty-seven alleged violations.[8] Defendant claims these seven excess discharges were unanticipated, unintentional, and immediately remedied. Therefore, defendant maintains, the upset defense applies. All of the seven alleged violations occurred in 1981 or 1982 during the period when defendant was operating under the permit issued on May 8, 1979. However, the provision for the affirmative defense of upset, 40 C.F.R. § 122.41(n) (1984) became effective only on August 13, 1979. 44 Fed.Reg. 32856. It is clear that the upset defense did not apply to permits already issued because § 122.41 requires that all the conditions applicable to NPDES permits "shall be incorporated into the permits either expressly or by reference," and "by reference" means by a specific citation to the regulations. Defendant's actual 1979 permit omits any mention of the upset defense. Brief for Plaintiffs in Support of Motion for Partial Summary Judgment, *Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories,* No. 84–1087, at Exh. F (D.N.J.1985). Instead, it contains a provision invalidating any defense other than bypass and power failure. Therefore, the upset defense does not apply to the violations defendant has cited.

■ Defendant next claims that there are disputed areas of fact as to the interpretation of the permits. Specifically, the alleged violations include violations of both "daily average" quantities discharged and "daily maximum" quantities. The permits, however, required monitoring and reporting of results only once a month. Defendant's reports of daily average discharges

---

**6.** 40 C.F.R. § 122.41(n) (1984) (" 'Upset' means an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee.").

**7.** 40 C.F.R. § 122.41(m) (1984) (" 'Bypass' means the intentional diversion of waste streams from any portion of a treatment facility.").

**8.** Violations numbered 45, 46, 47, 48, 83, 85 and 86 in Brief for Plaintiffs' in Support of Motion for Partial Summary Judgment, *Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories,* No. 84–1087, at Exh. K (D.N.J.1985).

were based on samples taken only once a month, and plaintiffs' alleged violations of the daily average quantity limitations are based entirely on defendant's reports of daily average discharges. Defendant claims there was an inconsistency between the permit limitations and the monitoring obligations, and this inconsistency at least creates an issue of fact about the interpretation of the permits that precludes summary judgment.

Here, defendant raises a question about the interpretation of the terms of the permits that is purely a question of law. All the permits defined "daily average" in a way that made it clear that it was to be determined by dividing the total of the daily samples in a given month by the number of days on which samples were taken.[9] The permits also required monitoring once a month,[10] but they allowed monitoring more frequently.[11] The intention of these provisions is unambiguous. The permits left it up to the permittee to decide how many days per month it monitored so long as it monitored at least once a month. Calculating the average was done the same way no matter how many daily tests were performed. Total results were divided by the total days when tests were made. Permittees had flexibility. If a daily test showed a violative discharge level, permittees were free to take more tests in subsequent days in hope the daily average for the month would not violate permit limitations. Whereas this interpretation is perfectly sensible, defendant's argument suggests that all the daily average limitations in all the permits were absurd. We find that the sensible interpretation is correct and that the permit limitations were not absurd. Therefore, this claim will not defeat summary judgment.

Defendant proceeds to maintain that the test results were inaccurate for a variety of technical or scientific reasons. Although defendant monitored its discharges itself, chose the private laboratories to analyze the results, and then reported these results on its DMRs and NCRs, defendant suggests there are genuine issues of material fact about the reliability of many of the results that plaintiffs allege to be in violation of permit limitations. We note that no scientific measurement is ever absolutely perfect, however, the preponderance of the evidence standard requires plaintiffs to show only that it is more likely than not that the DMR test results violate permit limitations. To prevail on summary judgment, plaintiffs need only demonstrate the absence of any disputed material fact, and that the facts demonstrate the probability of violation. We have reviewed defendant's exhibits and arguments, and we find insufficient possibility of monitoring inaccuracies to escape a motion for summary judgment.

Another alleged issue of fact exists, according to the defendant, concerning whether the EPA or NJDEP abused their discretion in failing to impose penalties for the alleged permit violations. We find this issue is completely irrelevant. The purpose of citizen suits under the FWPCA is to allow citizens to act as private attorneys general and stand in the shoes of the EPA and state agencies when they fail to act. See, e.g., Middlesex, 453 U.S. at 16–17, 101 S.Ct. at 2624–25. There is no suggestion in the FWPCA or the case law that a showing of administrative abuse of discretion is prerequisite to a citizen suit. Moreover, the issue before this Court is liability, not imposition of penalties.

Finally, defendant suggests there exists an issue of fact concerning whether the violations were so trivial as to invoke the de minimus doctrine which conserves judicial resources and protects de-

---

**9.** Brief for Plaintiffs in Support of Motion for Partial Summary Judgment, at Exhs. B at 14 (1974 permit), F at 2–3 (1979 permit), H at 13–14 (1982 permit). The definition in the 1974 permit is admittedly potentially misleading on how to measure daily averages, but there was only one reasonable method, and defendant followed it.

**10.** *Id.* at Exhs. C at 9, D at 9, F at 2–3, H at 13–14.

**11.** *Id.* at Exhs. B at 9, F at 6, H at 12.

fendants from meaningless litigation. *See Alabama Power Co. v. Costle,* 636 F.2d 323, 360 (D.C.Cir.1979). Application of this doctrine is committed to the sound discretion of the trial court. *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 687 n. 29, 99 S.Ct. 3055, 3075 n. 29, 61 L.Ed.2d 823 (1979). We decline to apply the *de minimus* doctrine. To do so would be inconsistent with the evident intent of Congress to penalize "any" discharge of pollutants in violation of permit limitations. 33 U.S.C. §§ 1311(a), 1319(d).

Accordingly, plaintiffs' motion for partial summary judgment is granted.