**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 2 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NORMAN BUFFORD; ZULA
BUFFORD,

    Plaintiffs - Appellants,

  v.

N. A. WILLIAMS, in his official capacity
as acting director of the Crescent Public
Works Authority and Acting Mayor of the
City of Crescent; CRESCENT PUBLIC
WORKS AUTHORITY,

    Defendants - Appellees.

No. 00-6055
(D. C. No. 98-CV-1570-A)
(W. D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **EBEL** and **KELLY**, Circuit Judges, and **WINDER**[**], District Judge.

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1.9. The case is therefore ordered

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable David K. Winder, Senior District Judge, United States District
Court for the District of Utah, sitting by designation.

submitted without oral argument.

Plaintiffs Norman Bufford and Zula Bufford brought this action in the United States District Court for the Western District of Oklahoma against defendants N.A. Williams and the Crescent Public Works Authority, alleging violation of the Federal Water Pollution Control Act, also known as the Clean Water Act, 33 U.S.C. § 1251 et seq., as administered in Oklahoma by the Oklahoma Pollutant Discharge Elimination System, Okla. Stat. tit. 27A § 2-6-201 et seq. Plaintiffs and defendants filed cross-motions for summary judgment. The district court granted defendants' motion, concluding plaintiffs failed to show a causal connection between defendants' facility and any pollutant found on plaintiffs' property. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

BACKGROUND

Wastewater Solutions, Inc. operates the wastewater treatment facility in Crescent, Oklahoma, pursuant to a contract with the Crescent Public Works Authority. The facility occupies 160 acres of land and consists of a three-celled total retention lagoon and a land application system. The total retention lagoon is operated in series, i.e., flows of wastewater enter cell No. 1, flow to cell No. 2, and then to cell No. 3. During the holding time in the lagoon, sewage in the wastewater is broken down by natural biological processes. The treated wastewater in cell No. 3 is appropriate for irrigation and is, in fact, the water used for irrigation at the facility. The cells in the lagoon are designed to be and

function as "no discharge" ponds. There is no evidence that cells are seeping or leaking.

The land application or irrigation system consists of a land application field, located east of the lagoon, equipped with a center pivot and an irrigation boom that applies treated wastewater from cell No. 3 to the field. Because the facility is considered a total retention system with land application, an Oklahoma Pollution Discharge Elimination System ("OPDES") permit[1] is not required for operation of the system.[2]

Oklahoma law requires that land application of wastewater via irrigation be conducted at an agronomic rate, i.e., a rate the does not exceed the ability of the crop grown on the land application field to absorb the nutrients in the wastewater. At Crescent, and at other wastewater facilities in Oklahoma, land application sites are designed to maximize evaporation and crop uptake of treated wastewater in order to prevent pooling or ponding of water on the land application field. In addition, any water soaking into the ground of these sites will be filtered by the soil. Therefore, the probability of contamination of underlying groundwater is minimal.

---

[1]The federal equivalent of this permit under the Clean Water Act is a National Pollutant Discharge Elimination System ("NPDES") permit. Because the United States Environmental Protection Agency has delegated authority to the Oklahoma Department of Environmental Quality to administer the Clean Water Act in Oklahoma, the required permit for those facilities that discharge into the waters of the State of Oklahoma is the OPDES permit rather than the NPDES permit.

[2]Even if the facility had been designed for discharge into the nearby Cimarron River, the wastewater in cell No. 3 would require no further treatment under an OPDES permit because the treated water is of such a quality that it would not degrade the river below the Beneficial Uses for the Cimarron River as established by the Oklahoma Water Resources Board.

In 1986, heavy rains caused an elevated groundwater table in the area. To lower the groundwater table and permit the construction of cell No. 3, defendants constructed a groundwater interceptor trench at the facility along the east side of the treatment lagoon. The interceptor trench was left in place after construction and currently serves two purposes: (1) as a channel for water originating offsite to flow across the facility property as it previously had; and (2) as an outlet for groundwater under the facility to insure that the separation between the lagoon cell bottoms and the groundwater table is maintained. The groundwater interceptor trench does not provide an outlet for water in the treatment lagoon. Similarly, there is no evidence that the interceptor trench contains pollutants from the treated wastewater that is applied to the land application field.

In 1994, cracks in the aging sewer collection lines in Crescent caused an infiltration problem at the facility by allowing storm water and groundwater to enter the sewage lines resulting in a volume of water exceeding design specifications flowing into the lagoon. To preserve the lagoon walls and prevent downstream flooding, discharges of treated wastewater from cell No. 3 were periodically made directly to the land application field by "unbuckling" the irrigation arm from its center pivot and allowing water to flow directly onto the land application field, by-passing the irrigation boom. The inflow and infiltration problems were repaired in the fall of 1994.

In May of 1999 a similar discharge was required after a tornado destroyed the irrigation boom at the facility. Once again, the discharge was of the treated wastewater

from cell No. 3. Test results for water samples taken from cell No. 3 during the post-tornado discharge indicated that the water in cell No. 3 was of better quality than water discharged by many treatment facilities that discharge water in compliance with OPDES permits. Water of this quality does not pose a threat to livestock or agricultural crops.

Plaintiffs Norman Bufford and Zula Bufford own property adjacent to each other in Crescent, Oklahoma. In May of 1998, plaintiffs hired an expert to perform a Limited Environmental Site Investigation. Plaintiffs' expert sampled water on the Bufford property, located southwest of the facility, and also sampled water on the Endicott property, located directly south of the facility. Both the Bufford and Endicott properties are used for agricultural purposes and for grazing cattle. Plaintiffs' expert found elevated levels of fecal coliform, total organic carbon, and chemical oxygen demand, indicating the presence of biodegradable organic material. Fecal coliforms exist in both human and cattle waste.

Plaintiffs' expert assumed for purposes of his investigation that the water he sampled on the Bufford and Endicott property was water from the facility, and he admitted that he had not actually observed water originating from the facility. Plaintiffs' expert never entered the facility site. He did not sample water from the interceptor trench which begins and ends on facility property, and did not sample water from the treatment lagoon. Plaintiffs' expert stated that he did not know if the land application system was in operation at the time he was taking samples from plaintiffs' property. Plaintiffs' expert

did not know the quantity of water that processed through the land application system when it was turned on, and did not know the groundwater level at the facility site.

Prior to construction of the facility there was a natural drainage pattern in which ground and surface water flowing from the current facility site flowed across the northwest corner of the Endicott property to the northeast corner of the Bufford property. The current drainage pattern is similar to the pattern that existed prior to construction of the facility. Surface elevations of the facility and the surrounding area reflect that neither the elimination of the facility nor the elimination of the interceptor trench would decrease the amount of groundwater surfacing on plaintiffs' property.

Plaintiffs filed suit under the Clean Water Act, claiming that since facility operations commenced there have been a significant number of non-permitted discharges from the facility across plaintiffs' property causing "environmental harm and detriment to approximately five to ten acres of plaintiffs' property." Specifically, plaintiffs claim that the groundwater interceptor trench is a "point-source" from which the facility is discharging pollutants. Plaintiffs and defendants filed simultaneous motions for summary judgment. The district court granted defendants' motion, concluding that plaintiffs' had "failed to establish a material question of fact regarding the origination or discharge of any pollutants from the Defendants' treatment facility."

DISCUSSION

We review the grant or denial of summary judgment de novo, applying the same

- 6 -

legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). Wolf v.

Prudential Insurance Co., 50 F.3d 793, 796 (10th Cir. 1995); Applied Genetics Int'l, Inc.

v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). Summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c). "When applying this standard, we examine the factual record and

reasonable inferences therefrom in the light most favorable to the party opposing

summary judgment." Applied Genetics, 912 F.2d at 1241. If there is no genuine issue of

material fact in dispute, then we next determine if the substantive law was correctly

applied by the district court. Id.

While the movant bears the burden of showing the absence of a genuine issue of

material fact, the movant need not negate the non-movant's claim, but need only point to

an absence of evidence to support the non-movant's claim. Celotex Corp. v. Catrett, 477

U.S. 317, 325 (1986). If the movant carries this initial burden, the non-movant may not

rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial

as to those dispositive matters for which it carries the burden of proof. Celotex, 477 U.S.

at 324; Wolf, 50 F.3d at 796. An issue of material fact is genuine if a reasonable jury

could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).

The Clean Water Act prohibits the discharge of any pollutant from a point source, except as provided for in the Act. See 33 U.S.C. § 1311 ("Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."); 33 U.S.C. § 1362 (12)(A) (providing that "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source"). Therefore, to establish a violation of the Act, plaintiffs in this case must put forth factual evidence of a point source discharge of pollutants by defendants. See, e.g., Michigan v. City of Allen Park, 501 F. Supp. 1007, 1014 (E.D. Mich. 1980).

Plaintiffs contend that because certain pollutants were detected in water samples taken from the Endicott property, located south of the facility, as well as samples taken from the plaintiffs' property, located southwest of the facility, the facility must be the source of the pollutants. Our review of the evidence of record leads us to conclude, as did the district court, that plaintiffs have failed to provide any credible evidence supporting this theory.

First, plaintiffs have failed to provide any evidence of a "point source" discharge from the facility. As the district court noted, plaintiffs failed to supply any affidavits regarding the flow of water from the facility, the use of the irrigation system, or any potential leaks or seepage. Although plaintiffs' expert expresses the opinion that water from the third cell of the lagoon, which is used to irrigate the field, soaks into the ground

and runs out of the interceptor trench, he failed to provide any evidence to support this theory. Plaintiffs' expert admits he did not enter the facility site. He did not sample water or soil from the interceptor trench and did not sample water from the treatment lagoon. In addition, plaintiffs' expert admits that he did not observe the land application system in operation, and was unaware of whether the system was in operation when he visited plaintiffs' property. Defendants, on the other hand, provided concrete evidence that the interceptor trench located on facility property is an outlet for naturally occurring groundwater, not discharge from the lagoon or irrigation system, and that water flows through the interceptor trench from sources located upstream.

Moreover, we agree with the district court's conclusion that even assuming evidence existed demonstrating that water from the facility either flows onto plaintiffs' property or somehow infiltrates the property's groundwater, there is no evidence that this water is polluted with fecal coliform originating from the facility. Defendants put forth substantial evidence suggesting that the fecal coliform detected on the Endicott and Bufford property could not have come from the facility. Fecal coliform are destroyed rapidly by biological consumption once they leave the intestinal tract and enter the environment, and the holding time in the lagoon at the facility is longer than the time needed for any fecal coliform in the water entering the facility to be destroyed. Additionally, samples of lagoon water revealed that there were no coliform organisms in cells No. 2 and No. 3. Finally, even if fecal coliform existed in cell No. 3–the water used

to irrigate the land application field–these organisms would be destroyed by the spraying process or by other microorganisms in the ground before the fecal coliform could migrate from the land application field.

Plaintiffs' expert limited his testing to water found on the Endicott and Bufford properties, both of which are used for grazing cattle. Fecal coliforms originate from both cattle and humans, and plaintiffs' expert admits it is impossible to differentiate fecal coliform originating in human waste from that originating in the waste of other warm-blooded animals such as cattle based on the type of tests used. Although plaintiffs' tests indicated that there were certain pollutants found at some of the test sites, these tests reveal nothing about the potential source of the pollutants, and therefore do not constitute evidence of a point source discharge of pollutants.

In sum, after conducting a thorough review of the evidence, we agree with the district court's conclusion that plaintiffs have failed to present any credible evidence demonstrating a point-source discharge of any pollutant from the facility.[3] Absent such

---

[3]On appeal, plaintiffs claim that the district court "failed to recognize that it is not necessary for the [plaintiffs] to prove to a scientific certainty that the [defendants'] operations are the primary source of pollution" found on their property. Br. of Appellants at 12. As support for this argument, plaintiffs cite Public Interest Research Group v. Powell Duffryn Terminals, 913 F.2d 64 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991); Student Public Interest Research Group, Inc. v. P.D. Oil & Chemical Storage, Inc., 627 F. Supp. 1074 (D. N.J. 1986); and Student Public Research Group v. AT&T Bell Laboratories, 617 F. Supp. 1190, 1202 (D. N.J. 1985).

Plaintiffs' reliance on these cases is misplaced as they are readily distinguishable. First, the language upon which plaintiffs rely concerns standing requirements. Second, the cases are distinguishable because in each instance there was clear evidence that

- 10 -

evidence, plaintiffs cannot establish the essential elements of their claim under the Clean Water Act.  Summary judgment in favor of defendants is therefore proper.

The district court's grant of summary judgment in favor of defendants is AFFIRMED.

ENTERED FOR THE COURT


David K. Winder
District Court Judge

---

defendants had discharged pollutants.  In each case the defendants had permits to discharge certain levels of pollutants into waterways, however, reports indicated that the defendants had exceeded the permitted amounts.  Accordingly, the issue in these cases was not, as in the present matter, whether plaintiffs put forth any evidence of a point source discharge, but whether the plaintiffs were able to establish a connection between the excess discharges, that were undisputably produced by defendants, and the specific injury alleged.

While it may not be necessary to link a specific discharge to a specific injury in order to meet standing requirements, to establish a violation of the Clean Water Act it is, however, necessary to put forth evidence of a point-source discharge of pollutants in the first instance.