**PAWTUXET COVE MARINA, INC., et al., Plaintiffs, Appellants,**

v.

**CIBA–GEIGY CORPORATION, Defendant, Appellee.**

No. 86–1227.

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1986.

Decided Dec. 18, 1986.

Jeffrey A. Lanphear, Cranston, R.I., for plaintiffs, appellants.

James Thornton, on brief for Natural Resources Defense Council, Inc., amicus curiae.

Karen H. Edgecombe, Bruce J. Terris and Terris, Edgecombe, Hecker & Wayne, Washington, D.C., on brief for Friends of the Earth, Sierra Club, Student Public Interest Research Group of New Jersey and Atlantic States Legal Foundation, amicus curiae.

Katherine L. Rhyne with whom Douglas E. Kliever, John M. Bredehoft, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., Michael P. DeFanti and Hinckley, Allen, Tobin & Silverstein, Providence, R.I., were on brief for defendant, appellee.

Before CAMPBELL, Chief Judge, ALDRICH and COFFIN, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

In 1979 plaintiff Pawtuxet Cove Marina, Inc. purchased a marina on a cove by the mouth of the Pawtuxet River in Rhode Island. Plaintiffs Russell and Beverly Hunt, owners of a residence on the cove, as well as officers and shareholders in Marina, Inc., purchased a second marina on the cove and leased it to Marina, Inc. In November 1983 plaintiffs sued defendant Ciba-Geigy Corp., in part for civil penalties under section 505 of the Clean Water Act, 33 U.S.C. § 1365, and in part for damages due to violations of Rhode Island common law. Defendant was located up river. From the penalty standpoint it, allegedly, had violated its permit under the National

Pollutant Discharge Elimination System by discharging effluents containing excessive pollutants. From the damage standpoint the presence of these pollutants had, allegedly, prevented dredging to improve access to plaintiffs' properties, causing economic loss and, in turn, stress-produced illnesses. On defendant's motion for summary judgment the court dismissed the penalty action for lack of jurisdiction. Diversity jurisdiction existed for the damage claims. However, upon plaintiffs' stipulating during trial that these, unless for nominal damages, which they waived, depended upon proof that the dredging would have occurred but for defendant's polluting, the court ruled that plaintiffs had not made out a case. Plaintiffs appeal. We affirm.

██ The Pawtuxet River area silts up. In the early 1960's an agreement was entered into whereby the Army Corps of Engineers, funded by federal, state, and municipal contributions, dredged it to a depth of six feet at mean low water. A breakwater was built for protection, which, unfortunately, increased siltation, and it was recognized that substantial periodic dredging would be required for maintenance. This expectation proved to be correct, but further dredging, though long needed, has not taken place. Indeed, one of the municipalities did not even fulfill its original obligations.

The principal impediment to maintenance dredging was the cost; everyone being in favor of the project, provided someone else paid. While discussions still continue, no money has ever been appropriated, federal or otherwise, nor have plaintiffs shown any appreciable prospect thereof. The problem was aggravated by a Rhode Island regulation passed in the early 1970's forbidding dumping of dredged materials in offshore waters. Since then a lack of disposal space has precluded almost all Rhode Island dredging, even of needed terminal facilities, let alone of recreational areas. It is true that some neighbors of possible disposal sites have objected to defendant's pollutants, but we agree with the district court that as a matter of law on the overall record this was an insignificant, and in no sense a "but for" factor. *Brodeur v. Desrosiers*, 505 A.2d 418, 423 (R.I.1986); *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. 309, 312–13, 342 A.2d 622, 625 (1975). Twenty years of negative history, quite apart from defendant's pollutants, with no indication of any change, left plaintiffs with nothing but hope. This was clearly insufficient to make out a case against defendant.

In this circumstance we need not consider plaintiffs' other common law obstacle, that actions for negligence generally require proof of physical, as distinguished from mere economic, harm. *Cf. Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir.1985); *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3271, 91 L.Ed.2d 562. *But cf. Burgess v. M/V Tamano*, 370 F.Supp. 247 (D.Me. 1973), *aff'd without opinion*, 559 F.2d 1200 (1st Cir.1977) (permitting fishermen to recover for pecuniary losses caused by oil spill).

██ We turn to the more open question, the district court's ruling that plaintiffs, as private citizens, could not maintain a Clean Water Act action simply to enforce penalties with respect to violations that had already ceased. Plaintiffs' complaint was, of necessity, limited to the past ("has discharged effluents"), because of the fact that, prior to its filing, defendant had completed a tie-in with a municipal treatment facility and had ceased operating under the permit. Plaintiffs, accordingly, did not and could not, at least prima facie, trace the statutory language, which is addressed to the present.

Sec. 505(a). Except as provided in subsection (b) of this section, any citizen [1]

---

**1.** A citizen is defined in subsection (g) as a "person or persons having an interest which is or may be affected." Since we dismiss on other grounds, post, we need not decide whether plaintiffs succeeded in showing such. See discussion in *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440 (D.Md.1985).

may commence a civil action on his own behalf—

> (1) against any person ... *who is alleged to be in violation* of (A) an effluent standard or limitation under this Act....

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 309(d) of this Act. (emphasis added)

While this failure might seem a short and conclusive answer, plaintiffs cite district court cases, culminating with the recent case of *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d 304 (4th Cir.1986), holding that the court not only may assess penalties for past violations in a citizen's suit (which, in itself, we do not question), but may entertain a suit seeking only that relief. Plaintiffs also cite language by Senator Muskie, post, one of the proponents of the Act, purportedly indicating the same intent.

We find it apparent, not only from this, but from a study of the statute as a whole, that its draftsmanship leaves something to be desired, in part, perhaps, because of the scope of the problems. We affirm the district court, but we think the proper interpretation of the statute lies somewhere between an absolute, literal, application of its language and the unlimited meaning adopted by the Fourth Circuit.

The *Gwaltney* court found the key statutory language—"is ... in violation"—ambiguous, and hence encompassing all past, as well as present, violations. The court reasoned that one "continues to be 'in violation' by having 'violated.' ... [T]he taint of a past violation is continuing." 791 F.2d at 309 (quoting *Student Public Interest Research Group v. Monsanto Co.*, 600 F.Supp. 1474, 1476 (D.N.J.1985)). For this it analogized the case of a taxpayer who underpaid one year, but did not the next, pointing out that, until he paid, he contin-

ued to be "in violation." We find the argument forced, and the analogy inapt. In the case of the taxpayer, the violation was the non-payment, and it, of course, continued until the obligation was met. A ceased improper discharge does not "continue." Moreover, the "violation" defined by the statute is not the non-payment of the penalty.

Nor does the statute speak in terms of "taint." This might be arguable if it had read "is a violator," but "is ... in violation" speaks in terms of activity. The clear import of section 505(a) is that citizens are empowered to seek injunctive relief against a polluter that "is in violation" of the Act, and that in connection with such an action the district court is authorized to award "any appropriate" civil penalties. With great respect to the Fourth Circuit, we find its conclusion of ambiguity unpersuasive, particularly when it would have been so easy for Congress to have said "has violated," instead of "is ... in violation" if the former was its intention, and with the difference being so conspicuous.

We note, too, that "effluent standard or limitation," ante, is defined in section 505(f)(6) as a "permit or condition thereof issued under section 402 of this Act, which *is* in effect under this Act...." (emphasis added), a clear use of the present. It is true that under section 505(f)(1)'s definition of "effluent standard or limitation" the incorporation of other sections by reference produces grammatical confusion, but, in sum, in speaking of any "discharge" not otherwise excepted, there is no retreat from the present tense.

This use does not seem inconsistent, historically, with the enforcement emphasis of the anti-pollution acts. The Clean Air Act, from which the Clean Water Act took the phrase "is ... in violation," *see* 42 U.S.C. § 7604(a), provided for injunctive relief only. Alertness of concerned citizens, *see* § 505(g), n. 1, ante, was of moment, but of secondary importance; even when, in enacting the Clean Water Act, Congress added penalties, such were to go to the government. There was no change in purpose.

Rather, House and Senate Reports on the Clean Water Act characterize the addition of civil penalties as simply a modification of the citizen's action for injunction authorized under the Clean Air Act.[2] Thus we cannot share the *Gwaltney* court's reliance upon the fact that if the words "is ... in violation" require a showing of a violation at the time of suit, many past violations would be immune to citizens' suits. Some immunity was an originally contemplated circumstance; the court uncovered no unique lacunae. No amount of discovering ambiguity in the quoted words can escape the fact that, with respect to alleged violations of permits, § 505(f)(6), ante, no action can lie for past violations unless the "permit ... is in effect." This consistently corresponds with the reference to violations in the present tense; past permit violations are relevant to the extent that they cast light on the propriety of an injunction, no longer appropriate if there is no longer a permit.[3]

There is, however, a more serious problem if the concept of a present violation requires proof of its occurring at the instant of suit. A violation may last only ten minutes. Moreover, section 505(b)(1)(A) requires a sixty-day notice before suit is brought, so that even a persistent violator may, temporarily, "clean up his act." We therefore think that the words "is ... in violation" should be sufficiently liberally construed to comport with the injunctive purpose of the Act—conduct indicative of continuing or renewed violations justifying an injunction, as distinguished from matters over and apparently done with, that would not warrant one. We find this possible in the fact that the statutory phrase is not the three words we have heretofore considered, but is "is alleged to be in violation." It is far less of a stretch to interpret these words as applicable to a present continuing intent than to take the *Gwaltney* court's encompassing a single past act. We would give the full phrase the practical construction that is given to the $10,000 requirement for jurisdiction in a diversity case. There jurisdiction is not necessarily lost if, in the final analysis, a lesser sum is involved; a reasonably held allegation is sufficient. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). We think the analogy excellent, and that the same construction is warranted, not only from the statutory wording,

**2.** *See* S.Rep. No. 414, 92d Cong., 1st Sess. 79 (1971), *reprinted in* 1972 U.S.Code Cong. & Admin.News 3668, 3745:

> The Committee has established a provision in the bill that would provide citizen participation ... modeled on the provision enacted in the Clean Air Amendments of 1970. As in that Act the provision in this bill is carefully restricted to actions where violations of standards and regulations or a failure on the part of officials to act are alleged. One modification would allow the Courts to impose civil penalties provided as a result of actions brought by citizens.

*See also* H.R.Rep. No. 911, 92d Cong., 2d Sess. 133 (1972) ("Section 505 closely follows the concepts utilized in ... the Clean Air Act. However, this legislation authorizes the courts to impose civil penalties, as well as injunctive relief."). Further support for this view may be found in congressional references to citizen suit provisions as a means of "abating" ongoing violations of the Act. *See*, e.g., S.Rep. No. 414 at 79–82, *reprinted in* 1972 U.S.Code Cong. & Admin.News at 3745–47.

**3.** Plaintiffs and amici rely on the remarks of Senator Muskie, one of the Act's principal sponsors. Senator Muskie stated, in part, that "[c]itizen suits can be brought to enforce against both continuous and intermittent violations" and that

> [the] 60–day provision was not intended ... to cut off the right of action a citizen may have to violations that took place 60 days earlier but which may not have been continuous. As in the original Senate bill, a citizen has a right under section 505 to bring an action for an appropriate remedy in the case of any person who is alleged to be, or to have been, in violation, whether the violation be a continuous one, or an occasional or sporadic one.

118 Cong.Rec. 33693, 33700 (1972). With due respect to Senator Muskie, we do not think an ambiguity is to be created out of whole cloth by his individual remarks. Moreover, the approach adopted in this opinion addresses what appears to be one of the Senator's principal apprehensions—that if only "continuous" violations are deemed to be covered under the Act, even persistent polluters may utilize the notice provisions to avoid liability.

but also from its functional purpose. If a defendant's history of past violations is such that it is reasonable to believe that misconduct will continue, not only is it reasonable to allege a continuing violation, but this is precisely the showing that would induce a court to issue an injunction. *See,* e.g., *SEC v. Bonastia,* 614 F.2d 908, 912 (3d Cir.1980). Such a construction corresponds both with the statutory language and with the statutory purpose.[4]

We accordingly hold that an action under 33 U.S.C. § 1365 may go forward if the citizen-plaintiff fairly alleges a continuing likelihood that the defendant, if not enjoined, will again proceed to violate the Act. In reviewing actions under this standard, the district court should consider, among other things, the isolated or recurrent nature of the infraction, the degree of scienter on the part of the defendant, and the sincerity of its assurances against future violations. *Cf. Bonastia,* 614 F.2d at 912. We thus agree with the result in *Hamker v. Diamond Shamrock Chemical Corp.,* 756 F.2d 392 (5th Cir.1985), in which the court held the plaintiff's allegation of a single, past violation to be insufficient. We do not, however, agree with the reasoning which, apparently, led the Louisiana district court, following the *Hamker* decision, to dismiss a number of actions simply because no violations occurred on the dates the complaints were filed. *See Sierra Club v. Copolymer Rubber & Chemical Corp.,* 621 F.Supp. 1013, 1015 (M.D.La. 1985). A plaintiff who makes allegations warranting injunctive relief in good faith, judged objectively, may recover a penalty judgment for past violations even if the injunction proves unobtainable.

In the case at bar, plaintiffs alleged violations of a permit that limited defendant's discharges of process wastewater. At the time plaintiffs brought suit, however, the defendant had ceased operating under this permit because of its completion of a tie-in arrangement with a municipal

treatment facility. Under these circumstances, there was no reasonable likelihood that defendant's alleged infractions would continue, and the district court correctly determined that the action should be dismissed.

Finally, there was no abuse of the court's discretion in denying plaintiffs' August 1985 motion to amend their complaint (a second time) to add a Clean Water Act claim after the court had ordered dismissal. The new incidents had been disclosed to plaintiffs long before they had filed their motion. Furthermore, they apparently concerned matters not even within the scope of section 505(a). Plaintiffs had been given much consideration, and the court was well warranted in not reopening the case.

*Affirmed.*

---

4. The *Gwaltney* court recognized this possible construction, but, without comment, chose not to adopt it. *See* 791 F.2d at 308 n. 9.