SIERRA CLUB, Plaintiff-Appellant,

v.

**SHELL OIL COMPANY,**
**Defendant-Appellee.**

SIERRA CLUB, Plaintiff-Appellant,

v.

MONOCHEM, INC., Defendant-Appellee.

SIERRA CLUB, Plaintiff-Appellant,

v.

**COPOLYMER RUBBER AND**
**CHEMICAL CORP., et al.,**
**Defendant-Appellee.**

Nos. 85-3753, 85-3762, 85-3763.

United States Court of Appeals,
Fifth Circuit.

May 29, 1987.

---

James Thornton, Natural Resources Def. Council, Inc., Ralph Hallo, New York City, Michael Osborne, New Orleans, La., for plaintiff-appellant.

Warren E. Byrd, II, Asst. Atty. Gen., Justice Dept., Lands & Natural Resources, Timothy W. Hardy, Baton Rouge, La., for amicus—State of La.

Karen Florini, Justice Dept., Land & Natural Resources Div., Washington, D.C., for amicus—Justice Dept.

Jose A. Berlanga, Houston, Tex., Adams & Reese, Paul O. Dicharry, Sam A. LeBlanc, III, New Orleans, La., for Shell Oil.

Tom F. Phillips, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Monochem, Inc.

Maureen N. Harbourt, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, William R. D'Armond, Baton Rouge, La., for Copolymer Rubber.

Frank S. Craig, III, Robert S. Taylor, Breazeale, Sachse & Wilson, Baton Rouge, La., Leonard A. Miller, Washington, D.C., for Allied Chemical & Bercen Southern Div. & Formosa.

Before VAN GRAAFEILAND *, HIGGINBOTHAM, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

We are here called upon to assess whether multiple, sporadic, past violations of various effluent limitations contained in National Pollutant Discharge Elimination System ("NPDES") permits held by the defendants may form the basis of a citizens' lawsuit under section 505 of the Clean Wa-

* Circuit Judge of the Second Circuit, sitting by designation.

ter Act.[1] 33 U.S.C. § 1365. Bound by our prior decision in *Hamker v. Diamond Shamrock Chemical Co.*, 756 F.2d 392 (5th Cir.1985) and by appellant's failure to raise a genuine question of material fact on the critical issue, we AFFIRM the decisions of the district courts which dismissed these cases.[2]

The underlying lawsuits were filed following a systematic research program in which the Sierra Club examined discharge monitoring reports ("DMR's") filed by every major industral discharger in Louisiana. The DMR's, which are prepared and filed by the defendant companies with the Environmental Protection Agency ("EPA"), may furnish some evidence concerning whether the discharger is in compliance with the terms of its NPDES permit for the period of time covered in each DMR. Having concluded by this research that the instant defendants were violating the terms of their NPDES permits, Sierra Club delivered the statutory 60–day notices and then filed separate lawsuits against each defendant. Each action averred that the defendant had violated various terms of its NPDES permit between January, 1980 and June, 1983, and all complaints alleged that the defendant "is now violating its permit, and will do so in the future." The complaints requested that civil penalties of up to $10,000 per day of violation for each violation be imposed, that an injunction be issued against further violations, and that Sierra Club recover costs including attorneys, witness and consultant fees, as provided for in 33 U.S.C. § 1365(d).

During the pendency of the lawsuits, this court issued its opinion in *Hamker* and held that district courts are without jurisdiction to hear citizens' suits alleging a single past pollutant discharge in violation of the Clean Water Act. Ongoing dis-

covery in these cases became focused on the application of *Hamker*. Because *Hamker* resulted in a dismissal of the plaintiff's complaint for want of jurisdiction, appellees each contested the court's subject matter jurisdiction, resting on affidavits and considerable documentary evidence concerning the status of the various alleged permit violations. In some of the cases, appellant responded that DMR's filed for the period after June, 1983 showed that further permit violations had occurred subsequent to the filing of its lawsuits. The district courts treated these motions differently. In the four cases consolidated under the *Copolymer* style, *see* note 2 *supra*, the court dismissed pursuant to Fed. R.Civ.P. 12(b)(1) for want of jurisdiction, without prejudice to any state law claim that might be asserted. 621 F.Supp. 1013. The *Monochem* court simply dismissed under Rule 12(b)(1), while the *Shell* court awarded a Rule 56 summary judgment to the defendant. These appeals followed.

### I.

The Clean Water Act intertwines the jurisdiction of the district court with the grounds for relief in a citizen enforcement action. Under the general caption, "Citizen Suits: jurisdiction," it authorizes

> any citizen [to] commence a civil action on his own behalf—(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation....

33 U.S.C. § 1365(a). Consequently, where the requirement that the discharger be "in violation" is interpreted to mean that a violation must be ongoing at the date the suit is filed, the plaintiff must allege an

1. The Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251 *et seq.* are commonly known as the Clean Water Act.

2. Five of the citizens' enforcement suits were brought by the Sierra Club in the Middle District of Louisiana. The actions against Copolymer Rubber & Chemical Co., Allied Corp., Bercen, Inc., and Formosa Plastics Corp., were consolidated by the district court and dismissed

on February 7, 1985. Subsequently, Sierra Club filed against Monochem also in the Middle District. This case was dismissed by the district court on December 18, 1985. The sixth of these consolidated appeals was filed against Shell Oil Co. in the Eastern District of Louisiana on July 24, 1984, and was dismissed on October 30, 1985.

ongoing violation to invoke the court's jurisdiction.

This Court affirmed a dismissal in *Hamker* for lack of jurisdiction because the pleadings there alleged a single oil spill prior to the date of suit and patently excluded the possibility of the defendant's being "in violation" thereafter. *Hamker's* emphasis on jurisdiction was appropriate to that case because a court may determine it lacks jurisdiction based on pleadings alone. 5 C. Wright & A. Miller, Federal Practice and Procedure § 1350 (1969). Two of the district courts here, apparently intending to follow *Hamker*, dismissed under Rule 12(b)(1) for lack of jurisdiction based on undisputed facts revealed in discovery rather than on the pleadings. Such fact-based dismissals are contrary to this circuit's practice of ruling on the merits, but they do not fatally affect the disposition of these cases.

■ This Court has held that when, as here, issues of jurisdictional fact are intermeshed with the merits of a case, "the jurisdictional issues should be referred to the merits, for it is impossible to decide one without the other." *McBeath v. Inter-American Citizens for Decency Committee*, 374 F.2d 359, 363 (5th Cir.1967).[3] The purpose of this rule is to discourage district courts from dismissing cases on the pleadings for want of jurisdiction unless the pleadings reveal a clearly insubstantial or frivolous claim. *Compare Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). Thus, "[w]here the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir.1981). Judicial economy further counsels resolution on the merits in these instances so that the court can avoid duplicate trials of facts essential to both juris-

diction and the merits of the claim. *Id.* at 415–16.

■ As a result, when a plaintiff has alleged an ongoing violation for purposes of § 1365(a), but he fails to demonstrate a fact issue about whether a defendant is "in violation," the court should grant summary judgment for the defendant on the merits under Fed.R.Civ.P. 56, instead of dismissing for want of jurisdiction under Fed.R.Civ.P. 12(b)(1).

■ Although the letter of *McBeath* and *Williamson* were violated in all but one of these cases, their spirit was not. None of the cases was cavalierly treated. The orders dismissing for lack of jurisdiction were entered following extensive discovery in each case. The district courts strained to afford Sierra Club an opportunity to demonstrate a fact issue on whether appellees were "in violation" of their permits when these suits were filed. The courts' ultimate determinations rest on a complete and undisputed factual record. Sierra Club does not contend that further discovery is necessary to support its position. Consequently, dismissing some of the cases for lack of jurisdiction was tantamount to summary judgment against Sierra Club on the merits of the critical issue of appellees' being "in violation" when the actions were filed. No reversible error follows from this procedural flaw.

## II.

■ The district courts found that under *Hamker*, the appellees in this case were not "in violation" of the NPDES permits when Sierra Club filed suit. In *Hamker*, the panel reasoned that section 1365 does not permit a citizen lawsuit to enforce the Clean Water Act where there is no ongoing violation of an effluent standard, limitation or order. Thus, the plaintiff there could not state a cause of action for a single past oil discharge. Judge Williams, specially concurring, suggested however that the statutory language "in violation" is broad

---

3. This is not to say that for cases in which the jurisdiction and merits are separable issues, such as whether $10,000 is actually in controversy in a diversity case, the district court may not dismiss pursuant to a fact finding rendered under Fed.R.Civ.P. 12(b)(1). *See* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1350 at 556 (1969).

enough to cover the "chronic episodic violator" who "intentionally turns off the spigot" just before a citizen brings suit. 756 F.2d at 399 (Williams, J., concurring). We need not enter a debate concerning the extent of the *Hamker* holding because the uncontradicted evidence in these cases demonstrated only past, sporadic or largely unconnected permit violations by each of the appellees. Not only was none of the violations ongoing at the date Sierra Club filed suit in either a "chronic episodic" or actual sense, but Sierra Club never attempted to establish, and in fact eschewed the possibility that there might be any requirement of demonstrating the ongoing or chronic nature of such violations. Sierra Club's proof failed to comport with its pleadings.

To demonstrate the failure of Sierra Club's proof, it is necessary to explain how the Clean Water Act affects industrial dischargers. The objective of the Clean Water Act is to restore and maintain the chemical, physical and biological integrity of the nation's waters. 33 U.S.C. § 1251(a). This objective was to be achieved by the application of increasingly more stringent "effluent limitations" designed to reduce gradually the amount of pollutants discharged into waterways. These effluent limitations are to be technologically based, meaning that dischargers must reduce the amount of pollutants by using specific technologies or their equivalents. "Effluent limitations" promulgated by the EPA are the actual restrictions on discharges which limit quantities, rates and concentrations of substances that may be discharged from point sources. 33 U.S.C. § 1362(11). Effluent limitations are usually expressed numerically (e.g., the number of pounds per day or the concentration of a pollutant discharged). Effluent limitations are to be applied to all point sources of discharge at a facility. A "point source" means the point of discharge of the pollutant-containing effluent. 33 U.S.C. § 1362(14). Effluent limitations, which were developed for entire industrial categories or subcategories, are transformed into limitations on individual plants within the category or subcategory by incorporation into the terms and conditions of NPDES discharge permits. 33 U.S.C. § 1342. If a discharger is in compliance with the effluent limitations contained in its NPDES permit, it is deemed to be in compliance with the Clean Water Act. 33 U.S.C. § 1342(k).

One industrial facility may have numerous point sources of discharge. These point sources may serve a single process unit, multiple units, single or multiple treatment facilities, or may only carry storm water runoff. To borrow appellees' example, a single site may contain an herbicide manufacturing plant, a chlorinated solvent manufacturing plant, and a plastics manufacturing plant, all of which are completely unrelated and belong to different industrial subcategories having different effluent limitations. Each plant might in turn maintain its own waste water treatment system and have several point sources for the effluents from its facilities. Due to the unique process and treatment arrangements at each plant, when incorporating effluent limitations into NPDES permits, EPA developed separate conditions for each pollutant at each separate point source. This is necessary to make effluent limitations technology-based. Also, because the treatment system for each point source may be unrelated to the treatment system for any other point source, a violation of an effluent limitation (a "parameter") at one point source is not a violation of any parameter at another point source even if the same pollutant is involved. Consequently, when determining whether a permit-holder has violated an effluent limitation, one must look at each parameter within each point source independently.

The DMR's submitted to EPA regularly by each of the appellees and relied on by Sierra Club to evidence permit violations separately identify effluent discharges at each point source for each parameter. Appellant's complaints simply aggregated the possible violations reflected by the DMR's at each appellee's facility over time, regardless whether they involved the same substance or the same point source of discharge. Although given ample opportunity to do so, Sierra Club did not attempt to

demonstrate that these isolated permit violations were the product of appellees' systematic neglect of discharge limitations or of inadequate pollution control facilities. We have thoroughly reviewed the record in each of these cases. The evidence submitted by appellees demonstrated in many instances that the alleged "violations" were approved under EPA "bypass" regulations,[4] were based on overly restrictive permit terms later liberalized by EPA[5], or were related to treatment methods voluntarily discontinued by the facility.[6] What remained of Sierra Club's factual allegations were occasional, minor discharges by the facilities in the face of permit compliance rates exceeding 95% for the balance of the period in question.

## III.

Sierra Club first argues that *Hamker* is distinguishable because it did not involve an NPDES permit. The statute belies any such distinction, for the citizen suit provision uses the term "effluent standard or limitation under this chapter" to include both permit and non-permit based violations of effluent standards found in the Clean Water Act. *See* 33 U.S.C. § 1365(f). This argument poses the classic distinction without a difference. Sierra Club has never explained why, beyond the fact that it is more likely to be a plaintiff, different standards for a facility's being "in violation" should obtain depending on whether an NPDES permit is in force. Appellant's unarticulated assumption may be that the mere aggregation of past permit violations or "exceedences" distinguishes these cases from *Hamker*. We disagree. *Hamker* explicitly rejected the applicability of the citizen suit provision to isolated past pollution discharges. *Hamker* was grounded firmly in the language of the statute, which uses the present tense formulation "in violation" to authorize citizen enforcement actions.

**4.** In its notice to Allied and as part of its complaint filed in district court, Sierra Club claimed 21 effluent limitations "exceedences" on point source 003 from January, 1983 to May, 1983 at Allied's Geismar, Louisiana chemical complex. It is apparently undisputed, however, that these "exceedences" were a direct result of "bypass" discharges approved by the EPA. Under 40 C.F.R. § 122.60 (1982) (superseded) Allied sought and obtained EPA approval of anticipated "bypass" resulting in diversion of water from its "treatment facility" and discharge into the Mississippi River. According to the terms of the administrative order allowing "bypass", the EPA found that Allied "anticipates the need to discharge process wastewater from the Clearwell of the water recirculation system because the Company claims that precipitation events and lack of production will cause the process wastewater level to rise into surge capacity of the Clearwell." Thus, on January 21, 1983 the EPA approved the requested discharge of wastewater until May 31, 1983.

**5.** For example, Sierra Club's assertions of "chronic episodic" violations is demonstrated most readily from its claim that Shell exceeded its daily maximum effluent limitations of Total Suspended Solids ("TSS") on outfall 002 at its Norco, Louisiana petroleum refinery approximately 46 times between April 1980 and June 1983. Recognizing the technical difficulties in complying with its then current NPDES permit requirements, the EPA liberalized Shell's TSS effluent limitations for outfall 002 in August 1983. While the new permit had no retroactive effect, application of the less restrictive terms to

the above cited violations would decrease the number of exceedences over the three year period to approximately eight.

The NPDES permit limitations were similarly liberalized for Formosa Plastics Corp.'s Baton Rouge, Louisiana chemical manufacturing plant. The EPA increased effluent limitations for total organic carbon ("TOC") because the plant's previous TOC limitations were found to be unnecessarily restrictive.

Finally, the EPA itself promulgated rules in 1982 reducing the generally required "pH" excursion compliance rate from 100% to only 99% compliance. See 40 C.F.R. § 401.17 (1986). The EPA determined that adjusting the standard "will establish a standard that well-operated and well-maintained plants could realistically achieve and will reserve the resources of both EPA and permittees for those instances when substantial pH control problems exist." 47 Fed. Reg. 24,534, 24,535 (1982). It is apparently undisputed that of Allied Chemical's 62 alleged pH "excursions"—incidents whereby the pH value of discharge wastewater exceeds applicable effluent ranges—the majority would not have violated current EPA guidelines, bringing compliance within the 99% requirement.

**6.** In an effort to ensure compliance with EPA hexavalent and total chromium effluent limitations, Shell's Norco refinery implemented a conversion to a non-chromate corrosion control system. As of February, 1985 this conversion has evidently been completed. The record reveals that Shell's last violation of permit limitations for chromium occurred on March 7, 1984.

Whether a defendant has engaged in one or ten discrete instances of impermissible effluent discharge cannot convert those actions from past to present conduct for purposes of the statute. The Fourth Circuit, which rejected *Hamker*'s construction of the citizen suit provision, hesitated to do so on the distinction between a NPDES permit violation case and a non-permit case. *Chesapeake Bay Foundation v. Gwaltney of Smithville, Ltd.*, 791 F.2d 304, 312 (4th Cir.1986), *cert. granted,* — U.S. —, 107 S.Ct. 872, 93 L.Ed.2d 827 (1987).

The balance of Sierra Club's briefs is devoted to demonstrating that *Hamker* is incorrect and represents an unworkable approach to enforcement of the Clean Water Act.[7] Even if *Hamker* were erroneously decided, our panel could not overrule a prior controlling decision in this Circuit. Only the en banc court has that authority. We are unpersuaded, however, that *Hamker* was wrongly decided. The First Circuit recently cited *Hamker* with approval in a factually similar single-discharge case. *Pawtuxet Cove Marina Inc., v. Ciba-Geigy Corp.*, 807 F.2d 1089 (1st Cir.1987). The court concluded that "the words 'is ... in violation' should be sufficiently liberally construed to comport with the injunctive purpose of the Act—conduct indicative of continuing or renewed violations justifying an injunction, as distinguished from matters over and apparently done with, that would not warrant one." *Id.* at 1093. In so doing, the First Circuit rejected the Fourth Circuit's construction of section 1365(a) rendered in *Chesapeake Bay Foundation v. Gwaltney.* There the court found the language "to be in violation" ambiguous and concluded that a citizen suit could be predicated upon past violations of the terms of an NPDES permit. 791 F.2d at 309. *Gwaltney* is the only circuit court

that differs with the construction of section 1365(a) approved by *Hamker.*

We further disagree with Sierra Club's assertion that the Clean Water Act's enforcement provisions are rendered "unworkable" by construing "in violation" in its grammatically natural sense to require some kind of ongoing effluent violation by the discharger.[8] The court in *Hamker* carefully explained the distinction between citizen suits and enforcement actions brought by governmental authorities. Both the federal and state governments can abundantly enforce the Clean Water Act by means of criminal and civil actions authorizing monetary or injunctive awards. 33 U.S.C. § 1319. Governmental actions were envisaged to be the central enforcement arm under the Act. *Hamker,* 756 F.2d at 395. The private enforcement action, on the other hand, is supplementary to the scheme of the statute overall. As noted in *Hamker,* the required 60 days' prior notice of a plaintiff's intent to file suit under the citizen provisions may encourage a defendant who is violating effluent limitations to "clean up his act" before suit is filed. *Id.* at 396. Moreover, where a government action is being diligently prosecuted, the citizen is barred from bringing suit. 33 U.S.C. § 1365(b)(1)(B). We think it unlikely that Congress's explicit restrictions on the right to bring private enforcement actions significantly impair the efficacy of the general regulatory framework.

In affirming the judgments of the district courts on the foregoing grounds, we are not required to decide other issues presented by this appeal. Specifically, we need not determine whether Sierra Club has standing to prosecute the instant actions, whether private lawsuits may be filed only for violations of NPDES permits currently in force,[9] or whether the citizen

---

**7.** Sierra Club is seriously hampered in arguing *Hamker's* distinction from the present cases because Sierra Club's amicus brief in *Hamker,* asserting the arguments made here, was obviously rejected by our prior panel.

**8.** The First Circuit noted how easy it would have been for Congress to authorize citizens suits against any party alleged "to have violated" the

Clean Water Act. *Pawtuxet Cove,* 807 F.2d at 1092.

**9.** Construing § 1365(f), which allows private enforcement actions to enforce a "permit or condition thereof ... which is in effect under this chapter", the court in *Pawtuxet Cove* held that no private enforcement action could be brought for violations of a permit under which the defendant had ceased operating. 807 F.2d at 1094.

suit section of the statute unconstitutionally confers powers of the executive branch of government upon citizens.

Sierra Club finally argues that the district court abused its discretion in awarding costs of suit be in favor of Shell Oil Company, one of the appellees herein. Pursuant to 33 U.S.C. § 1365(d), the court is permitted to award costs of litigation, including attorney and expert witness fees, to any party whenever the court determines such award is appropriate. Sierra Club suggests no basis for finding an abuse of discretion, and we perceive none.

The judgments of the district courts are AFFIRMED.