**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, and Friends of the Earth, Plaintiffs,**

v.

**UNITED STATES METALS REFINING CO., Defendant.**

Civ. A. No. 86–2041.

United States District Court,
D. New Jersey,
Civil Division.

Sept. 22, 1987.

As Amended Oct. 1, 1987.

Terris, Edgecombe, Hecker & Wayne, Washington, D.C., by Bruce J. Terris, Laraine L. Laudati, for plaintiffs.

Greenberg & Prior, Princeton, N.J., by Linda E. Johnson, for defendant.

## OPINION

BARRY, District Judge.

Plaintiffs, Public Interest Research Group of New Jersey ("PIRG") and Friends of the Earth ("FOE") bring this citizens'[1] suit against the United States Metal Refining Co. ("USMR") alleging violation of the Federal Water Pollution Control Act ("FWPCA"). Plaintiffs now move for partial summary judgment. Defendant has cross-moved to dismiss. For the reasons that follow, defendant's motion to dismiss will be denied and plaintiffs' motion will be granted.

## FACTS

Plaintiffs are non-profit corporations whose members reside in the vicinity of, own property, or recreate in, on, or near the heavily polluted waterway known as the Arthur Kill. Defendant has for many years engaged in the smelting and recycling of various metals at a facility in Carteret, New Jersey, which was apparently in its heyday the largest facility of its kind in the United States. USMR uses enormous amounts of water for cooling, "quenching," and other metal operations. Some of this water finds its way into the Arthur Kill through three USMR outfalls enumerated DSN 001, 002 and 004. Prior to February 1987, DSN 001 discharged fluids used in USMR's Nickel Salts Department. DSN 002 services the facility's storm water treatment plant which includes an 8.5 million gallon reservoir. DSN 004, later designated as 003, is a non-contact cooling water discharge point.

On September 30, 1974, the United States Environmental Protection Agency ("EPA") issued USMR a National Pollutant Discharge Elimination System ("NPDES") permit for discharge into the Arthur Kill pursuant to the newly amended FWPCA.[2] The effluent guidelines of this permit were modified in 1977 and remained in effect until July 1, 1986 despite technical expiration of the permit in November of 1979. During this time USMR designed and implemented a water reservoir and recovery system designed to achieve zero discharge at DSN 002. Under this system, water pumped into the plant and used for pro-

---

1. Title 33, Section 1365 of the United States Code provides that "any citizen may commence a civil action on his own behalf—(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter...."

2. The 1972 amendments effected a fundamental change in Congressional policy toward clean water. While prior Acts focused on the quality of the receiving waters, the 1972 amendments sought to control pollution at discharge points. In furtherance of this policy, the law as currently enacted sought zero discharge levels by 1985. 33 U.S.C. § 1251(a)(1) (1982). Commentators have described the Act as it existed prior to 1972 as "virtually unenforceable." *See generally,* Note, Citizen Suits Under the Clean Water Act, 38 Rutg.L.Rev. 813 (1986).

cessing was returned to the central 8.5 million gallon capacity reservoir mentioned previously. After solids and sludges settled out, the water would be pumped back into the plant's water system for reuse in the metal operations. Because of the smelting and other operations, a considerable amount of water evaporates. When the plant is in full use, the system was designed to serve the plant's water needs without discharge into the Arthur Kill. In fact, since the reservoir was put on-line in 1977, USMR achieved significant periods of zero discharge at 002 on four separate occasions.

In 1982, the EPA delegated, pursuant to statute, the power to issue discharge permits to the New Jersey Department of Environmental Protection ("DEP"). Pursuant to statute, the DEP continued the effectiveness of USMR's 1974 permit. N.J. S.A. 52:14B–11. In April of 1985, DEP issued a draft renewal permit which would have required effluent limitations of zero discharge by April 22, 1987. Then, in October of 1985, USMR announced plans to gradually phase out smelting operations at the Carteret plant. According to defendant, because water no longer evaporated in the smelting process, the reservoir had reached its capacity. Correspondingly, the system had lost its "surge" capacity. On November 27, the Carteret area experienced heavy rainfall that resulted in USMR bypassing the treatment system and discharging a large amount of untreated water into the Arthur Kill. Defendants further contend that the shutdown of smelting operations caused variations in steam pressure which resulted in various effluent excursions at 001.

In February, 1986, USMR restarted smelting and refining operations in order to process remaining inventories. However, because of a water main break, over 24 million gallons of water were added to the system over a two and one-half month period resulting in further discharges at 002 which finally ended on May 27, 1986. Meanwhile, on May 22, 1986, DEP issued defendant a new permit requiring zero discharge as of July 1, 1986. Plaintiffs then filed the instant action on May 26th. De-

fendant received a temporary stay of the permit in state court until July 14, 1986 in order to give the DEP an opportunity to modify the permit presumably to allow for periods of significant rainfall. On June 30, 1986, the parties to the instant action then entered into a consent decree against future violations. Then, on July 14, 1986, DEP modified the permit to the extent it limited the volume of discharges at 002 during rainfall events but confirmed those aspects of the permit that prohibited discharge in the absence of rain and further continued permit limitation on certain pollutants when discharges did occur.

Plaintiffs now move for partial summary judgment on liability for 494 separate violations of USMR's 1974 and 1986 permits occurring between December 1977 and September 1986. Defendant raises, however, numerous affirmative defenses to many of these violations in support of its motion to dismiss. These defenses include statute of limitations, "bypass" and "upset," the later two terms of art under EPA regulations. Defendant further argues that certain alleged violations which plaintiff claims result from underreporting of excursions raise factual issues precluding summary judgment.

■■■ I now hold, in conformity with the other judges of this court, that no statute of limitations applies to citizen suits under the FWPCA; nor is this action, filed before defendant's 1974 permit expired, barred by the supersession of that permit by defendant's 1986 permit. I will, therefore, deny defendant's motion to dismiss in its entirety. I further hold that defendant has failed to meet its burden of establishing the affirmative defenses of "bypass" and "upset," and has also failed to raise a material issue of fact regarding daily maximum violations left off defendant's Discharge Monitoring Reports ("DMR's") but revealed by defendant's worksheets and has similarly failed to raise a material issue of fact with regard to those claims where defendant sampled ph over and above its permit requirements. I will address these defenses seriatim.

As an initial matter, it should be noted that absent the affirmative defenses advanced here there can be no doubt as to defendant's liability for the permit violations at issue in this case. By July 1, 1977, USMR like all other point sources subject to a NPDES permit, (a) had to be in compliance with the effluent limitations contained in its permit and (b) was required to monitor its discharges and report the results to EPA or to the state in DMR's. Violation of either aspect is a violation of Section 301 of the Act and subjects the defendant to civil liability under principles analogous to the common law theory of strict liability. Accordingly, partial summary judgment is granted on those violations to which defendant raises no defense.[3]

## THE STATUTE OF LIMITATIONS

Defendant first asserts that many of the alleged violations at issue here are time-barred. Defendant advances three separate theories in support of this argument. First, it argues that no private cause of action exists for past violations of the Act unless the permit which is allegedly violated is in effect when the suit is filed. Second, it urges the court to adopt the five-year statute of limitations found in 28 U.S. C. § 2462. Third, and in the alternative, it seeks for the court to "borrow" an analogous state limitations period. I now hold that since the uncontroverted facts show that defendant's 1974 permit was in effect when this suit was filed and that plaintiffs sought prospective relief as well as relief for prior violations this action cannot fail as an improper effort to enforce an expired permit. I further hold that no limitations period, either state or federal, restricts citizen's suits under the Clean Water Act.

Defendant first argues that the statutory language of the Act can be interpreted to preclude citizens from bringing suit to remedy violations of permits that are no longer in effect.[4] This argument is essentially a corollary of the argument accepted in the First Circuit, see *Pawtuxet Cove Marina, Inc. v. Ciba–Geigy Corp.*, 807 F.2d 1089 (1st Cir.1986), and the Fifth Circuit, see *Hamker v. Diamond Shamrock Chemical Co.*, 756 F.2d 392 (5th Cir.1985), but rejected in the Fourth Circuit, see *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d 304 (4th Cir. 1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 872, 93 L.Ed.2d 827 (1987), that citizen suits may not be brought to remedy purely past violations. The procedural history of this case reveals that there are two reasons why this argument lacks merit. First, when this lawsuit was brought in May of 1986 defendant was still subject to the 1974 permit. Thus, there is no factual basis for defendant's assertion that plaintiffs sought, at the time this action was filed, to merely vindicate an expired permit.

Second, even if I construe defendant's argument to be that an expiration of a permit subsequent to the filing of suit, but before judgment, bars relief, there is no precedential support for defendant's position, nor is it clear how there could be. *Pawtuxet Cove*, cited by defendant, is factually inapposite to the case at bar. In *Pawtuxet*, the Court of Appeals for the First Circuit held, in rejecting the reasoning of the *Gwaltney* court, that a citizen suit may not be brought to remedy only past violations. In that case, future violations of the permit were precluded by the defendant's tie-in to a treatment plant prior to institution of suit. *Pawtuxet*, 807 F.2d at 1091. In the instant case, plaintiffs did not merely seek penalties for acts that could not be repeated. At the time suit was brought defendant had been, was, and threatened to be in violation of the Act. Significantly, the prayer for relief in this

---

**3.** My review of plaintiffs' list of alleged violations, *see* Plaintiffs' Brief in Support of Motion for Summary Judgment at Exhibit R, and defendant's objections to that list, reveals no defense to the following alleged violations: 247–252, 254–260, 262, 264–267, 283, 284, 286–297, 324, 328, 330, 331, 333, 339, 489 and 490. Plaintiffs' motion for summary judgment as to these 40 violations is, therefore, granted.

**4.** The difficulty arises from § 505 of the Act which provides for citizen suits "against any person ... who is alleged *to be in violation* of [the Act]." 33 U.S.C. § 1365(a)(1) (1982) (emphasis added).

case included equitable remedies which resulted in a consent order against future violations. The fact that the violations spanned two permits, one now expired because it was superceeded by the current one, does not change the prospective nature of plaintiffs' suit at the time it was brought, an element totally lacking in *Pawtuxet. Id.,* 807 F.2d at 1092 (court does not question penalties for past violations so long as that is not the only relief sought). I, therefore, deny defendant's motion to dismiss on the ground that its 1974 permit expired subsequent to the filing of this suit.

Defendant next urges the court to adopt either a state statute of limitations or the general limitations period contained in 28 U.S.C. § 2462. Whenever Congress fails to incorporate an express limitation period into a statute creating a private cause of action, as in the Clean Water Act, it is axiomatic that court's may "borrow" an analogous state statute of limitations. *Johnson v. Railway Express,* 421 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1975). Defendant offers N.J.Stat.Ann. § 2A:14–10(a) which places a two-year limitation on forfeiture claims recoverable by the sovereign.[5] The fundamental flaw in adopting 14–10(a), or for that matter any other state limitation period, is the inevitable frustration of national policies. *See Knoll v. Springfield Township School District,* 699 F.2d 137 (3d Cir.1983). As the Honorable Herbert J. Stern noted in *Student Public Interest Research Group v. AT & T Bell Laboratories,* 617 F.Supp. 1190 (D.N.J. 1985), the FWPCA contemplates uniform "enforcement mechanisms for citizen and government suits." *Id.* at 1202. Clearly, if state legislatures could control the effectiveness of citizen suits in their individual states by adopting truncated limitations periods, national uniformity would suffer.

This reasoning applies with equal force to the question of the applicability of 28 U.S.C. § 2462. That statute provides that:

> [e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

*Id.*

Although application of this statute would eliminate the possibility of conflicting state limitation periods, a different but equally worrisome problem would develop. Under the statutory scheme, the primary responsibility for enforcing effluent limits lies with the states. 33 U.S.C. §§ 1251(b), 1319(a)(1), (2) (1982). Further, a citizen's suit may not be brought until the state and the EPA are first notified of the violations, 33 U.S.C. § 1365(b)(1)(A), and only if neither the state nor the EPA has commenced and is diligently pursuing a civil or criminal action. 33 U.S.C. § 1365(b)(1)(B). Because neither the state nor the federal government are bound to any limitation period, it is easy to conceive of a situation of persistent ongoing violations in which violations would be immunized by the passage of time mandated by the waiting period applicable to citizen's suits. As one court put it: "citizen suits ... would be hampered in a way state efforts are not, and the clear policy favoring uniformity in enforcement would be thwarted." *AT & T,* 617 F.Supp. at 1203 (D.N.J.1985). I, therefore, hold that none of the 464 alleged violations are time-barred under any of the theories proffered by defendant. Accordingly, I will grant partial summary judgment as to each of the violations for which the statute of limitations is the only defense interposed.[6]

---

5. Under the Act civil penalties in a citizen's suit are payable to the Treasury and not to the plaintiff. *Middlesex Cty. Sewerage Authority v. Sea Clammers,* 453 U.S. 1, 14 n. 25, 101 S.Ct. 2615, 2623 n. 25, 69 L.Ed.2d 435 (1980).

6. My review of plaintiffs' list of alleged violations, reveals that my rejection of defendant's statute of limitations defense re-orders the following violations of the Act: 1–57, 60–62, 67–145, 147, 148, 151, 152, 154–159, 162–164, 168, 169, 171–174, 178–181, 183, 184, 186–189, 192–

Defendant next argues that violations 368 through 373 are not properly subject to a summary judgment motion because of the asserted defense of "bypass." "'Bypass' means the intentional diversion of waste streams from any portion of a treatment facility." 40 C.F.R. § 122.41(m). As noted previously, as early as October, 1985 USMR had announced plans to shut down its smelting facility. The resulting lack of evaporation combined with desludging operations and significant rainfall to overburden defendant's reservior system. On Wednesday, November 27, 1985, the day before Thanksgiving, after a significant storm, USMR determined that it needed to bypass the treatment system and discharge untreated stormwater into the Arthur Kill. By November 29, the day after Thanksgiving, the recycle system was reactivated and, according to defendant, only minimal bypass occurred over the weekend. On Tuesday, December 3rd, USMR telephoned the DEP to inform them of the bypass and then confirmed that conversation by letter dated December 5th.

■ There are several reasons why defendant's defense of bypass is unavailing on the facts of this case. I need only address two. Assuming for a moment that defendant's permit would allow a bypass defense,[7] defendant has failed to meet at least two of the three prerequisites to the defense found in the regulations. Title 40 C.F.R. 122.41(m)(4)(i) prohibits a bypass unless:

(A) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

(B) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate

back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventative maintenance; and

(C) The permittee submitted notices as required under paragraph (m)(3) of this section.

*Id.*

First, the uncontroverted facts demonstrate that defendant cannot satisfy paragraph (B). As plaintiffs point out, defendant decided as early as August, 1985 to shut down its smelting operations. Hence, defendant was experiencing "downtime" within the meaning of the regulation. Affidavit of Edward Deutsch ¶ 10. By defendant's own admission, the treatment system relied upon the consumption of water during smelting in order to achieve balance in the reservior. In fact, the system was intentionally designed that way to alleviate the need to discharge at 002. "Reasonable engineering judgment" aside, it does not take a skilled scientist to realize that a loop system that takes in water, but does not use it or discharge it, would eventually exceed its capacity. Moreover, USMR's previous use of storage tanks demonstrates that USMR was aware that the reservior was at or near capacity. Further, the success of the auxiliary pumps placed on line on November 29th shows the availability of "feasible alternatives" to bypass. Tracking the language of the regulation, defendant has failed to show that it could not have prevented the bypass by installing "adequate back-up equipment ... during normal periods of equipment downtime."

Second, paragraph C requires the permittee to submit notice of a bypass "as required under paragraph (m)(3) of this sec-

196, 198, 199, 202, 203, 206, 207, 210–221, 223–227, 231, 232, 235 & 240–245.

**7.** It is not at all clear, however, that this assumption has any basis in fact or law. Defendant's 1974 permit expressly prohibited any bypass of the water treatment system:

19. *Bypass Provision.* There shall be no bypass of the waste treatment facilities which

would allow the entry of untreated or partially treated wastes to the receiving waters. NPDES permit No. NJ0001899, appended to Plaintiff's Brief in Support of Motion for Preliminary Injunction, Exhibit A. This provision itself is sufficient to defeat defendant's bypass defense. *AT & T,* 617 F.Supp. at 1204.

tion." Assuming, without deciding, that the bypass that occurred was "unanticipated," [8] (m)(3) mandates that the defendant satisfy the 24 hour notice provision found in 40 C.F.R. 122.41(1)(6)(i):

The permittee shall report any noncompliance which may endanger health or the environment. Any information shall be provided orally within 24 hours from the time the permittee becomes aware of the circumstances. A written submission shall also be provided within 5 days of the time the permittee becomes aware of the circumstances. The written submission shall contain a description of noncompliance including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.

*Id.*

This provision clearly states that the permittee must orally notify the applicable agency within 24 hours of the time the permittee "becomes aware of the circumstances" giving rise to the bypass. However, defendant, by its own admission, did not notify the DEP orally until December 3rd, six days after the bypass had begun and five days after notice under the regulation was due. Similarly, the written notice was not sent by defendant until Thursday, December 5th, three days late under the regulations.

Defendant's only explanation for the delay—that the event occurred over a holiday weekend—is an insufficient defense. First, the bypass began and, hence, the defendant became "aware" on Wednesday, the day before the holiday. Second, the regulation provides no exception for holidays, a provision easily inserted in a statute or regulation computing time. *See e.g.* Federal Rule of Civil Procedure 6(a). Third, the requirement is not onerous. A facility as large as defendant's must be charged with the duty

to maintain personnel knowledgeable about environmental regulations on call or on the premises in charge of operations at all times. Further, notice to the DEP was but a phone call away. See N.J.A.C. 7:14A–2.-5(a)(12)(vi)(2) (24 hour DEP hotline for the reporting of environmental emergencies including bypasses). In short, defendant has provided no compelling reason to excuse its noncompliance with an important and mandatory reporting requirement.

■ Defendant's failure to follow the EPA regulations is just as fatal to its upset defense. Under the regulations an upset is defined as:

... an exceptional incident in which there is unintentional and temporary noncompliance with technological based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

40 C.F.R. § 122.41(n)(1). Even if I assume without deciding that defendant's 1974 permit allows for an upset defense [9] and even if I assume without deciding that defendant's numerous and repetitive violations are "temporary" and "exceptional" incidents, defendant has failed to offer any evidence to demonstrate compliance with the regulations:

A permittee who wishes to establish the affirmative defense of upset *shall* demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

(i) An upset occurred and that the permittee can identify the specific cause(s) of the upset;

(ii) The permittee facility was at the time being properly operated;

---

8. As noted, it is not at all clear that defendant should not have anticipated difficulties with the reservoir. Under the regulations defendant must submit notice of anticipated bypasses "if possible at least ten days before the ... bypass." 40 C.F.R. § 122.41(m)(3)(i).

9. Defendant's 1974 permit unlike its 1986 permit did not include an upset condition. See *supra* note 7.

(iii) *The permittees submitted notice of the upset as required in paragraph (1)(6)(ii)(B) of this section (24 hour notice);* and

(iv) The permittee complied with any remedial measures required under paragraph (d) of this notice.

40 C.F.R. § 122.41(n)(3) (emphasis added). Here, as with the bypass defense, defendant has ignored the 24 hour notice provision. In fact, with regard to the upset defense, plaintiffs demonstrate that defendant waited up to a month to report purported upsets.

Nor am I persuaded by defendant's attempt to characterize the failure to follow § 122.41(n)(3) as merely a procedural error. First, as in any statute or regulation, the deliberate use of the word "shall" establishes the mandatory nature of the directive. *United States v. Kravitz,* 738 F.2d 102, 104 (3d Cir.1984). Second, the notice provisions are just one part of the statutory and regulatory scheme of permittee self-regulation and monitoring that underpins the Act. Thus, even if defendant were to argue that "shall" does not mean what its plain meaning connotes, the EPA's own interpretation of the regulation belies defendant's description of the notice as merely procedural:

> To establish an upset defense, a permittee must notify EPA of its occurrence within five days and, in any enforcement action, must demonstrate the specific cause of the upset and that the violation was beyond the permittee's reasonable control. Since permittees must develop the information necessary to establish the defense at the time of the upset, the demonstration requirements serve to encourage permittees to examine the treatment facility and to take steps to prevent future noncompliance resulting from the cause of the upset.

49 Fed.Reg. 38038 (Sept. 26, 1984)

The importance of this procedure is borne out by the facts of this case. Here, many of defendant's violations occurred because of sub-freezing temperatures during the coldest winter months. Yet, these violations occurred winter after winter after winter. Not only does this show that these particular violations were not "exceptional," *see SPIRG v. Jersey Central Power and Light Co.,* 642 F.Supp. 103, 108–109 (D.N.J.1986) ("nothing 'temporary' about" defendant's numerous violations), it also shows that defendant was not encouraged "to examine the treatment facility and to take steps to prevent future noncompliance." *Id.*

The words of the Honorable Harold A. Ackerman in similar factual circumstances are instructive:

> Defendant has provided no evidence that satisfies any of [the] requirements [of the upset defense] for any particular permit violation alleged by plaintiffs. Instead, defendant broadly asserts that all of its permit violations qualify as upsets. EPA's regulations do not permit this type of blanket defense. They require that defendant demonstrate through relevant evidence that each upset is "an exceptional incident" and meets all the other requirements of the regulation. For example, EPA's regulations require that the defendant show that it provided EPA and NJDEP with 24–hour notice. Defendant's upset defense is defective as a matter of law as to all of its violations on this ground alone.

*Student Public Interest Research Group v. P.D. Oil and Chemical,* 627 F.Supp 1074 (D.N.J.1986). Judge Ackerman's reasoning is equally applicable to the facts of this case. I, therefore, reject both defendant's bypass and upset defenses for failure to abide by the notice provisions of § 122.41(n)(3). *See id.; see also United States v. Metropolitan District Commission,* Civ. No. 85–0489 (D.Mass. September 5, 1985) [Available on WESTLAW, 1985 WL 9071]. I will, therefore, grant plaintiffs' motion for summary judgment on these violations for which those defenses are the only, or the only remaining, defenses.[10]

---

**10.** Those violations are as follows: 58, 59, 63–66, 233, 236, 238, 239, 268, 282, 298, 299, 301, 302, 304–309, 312–323, 341–48, 350–352, 354, 355, 359, 360, 362–364, 368–379, 382–385, 397–

Defendant next argues that it should not be held liable for those violations that plaintiffs "discovered" in documents provided by defendant during discovery. These examples of "underreporting" fall into two categories. The first group involves a difference between the parties over defendant's obligation to report "maximum" violations on its monthly reports. Defendant contends that it interpreted its reporting obligations to require only the highest single violation per month. For example, for the month of February, 1980, defendant exceeded its daily maximum limitation for zinc on four occasions yet only reported on its monhtly DMR the most egregious violation. Plaintiffs contend that the three additional exceedences, derived from defendant's worksheets, are also violations of the Act.

■ The primary thrust of defendant's argument is that new government-supplied DMR forms provided space to report only one excursion per month. Thus, defendant's argument goes, it assumed that its permit obligations had been altered. Defendant's assumption borders on the ludicrous. Defendant's 1974 permit clearly prohibited, after March 31, 1976, daily discharges of zinc that exceeded 1.26 kilograms. NPDES Permit No. NJ0001899, ¶ 10 (hereinafter, "Permit"), appended to Plaintiffs' Brief in Support of Motion for Preliminary Injunction, Exhibit A. Defendant was required to monitor that parameter weekly, Permit, ¶ 12(a), and report the results in its DMR's, Permit ¶ 12(f) ("[t]he results *of the above monitoring requirements* shall be reported by the permittee *in the units specified* in ... [Paragraph] 10 [emphasis added]).

These precise requirements cannot be waived in the off-handed way defendant suggests. Changes in permits may result only after certain regulatory procedures are followed and then only for certain reasons. See 40 C.F.R. § 124.5. Defendant simply failed to meet the reporting requirements of its permit for those daily excursions over and above the one violation reported on defendant's DMR's. Because defendant does not contest that these violations occurred, only that they need not have been reported, an argument which has no basis in fact, plaintiffs are entitled to partial summary judgment on those violations. *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 106 S.Ct. 1348 (1986) (summary judgment appropriate when record as a whole reveals no rational trier of fact could find for nonmoving party).[11]

Defendant next contends that alleged violations 311, 388, 389, 393, 394, and 425–27, which are allegedly ph excursions at 002 derived from defendant's worksheets, are not really violations at all. Defendant contends, essentially, that these worksheets represent "upstream" valuations used to insure compliance. There is absolutely no evidence in the record to support this conclusion. In fact, every indication is to the contrary. The January, 1984 worksheet is illustrative. The worksheet itself [12] plainly indicates that it represents values taken at the 002 outfall. In fact, this same sheet provided the basis for violation 310, a violation USMR did not allege did not occur at 002, only that it need not have been reported. Significantly, defendant has not offered any affidavit or pointed to anything

404, 406, 407, 409–412, 415, 416, 420, 421, 426, 428–433, 435, 436, 439, 440, 444–446, 450, 451, 455–58, 460–461, 463–466, 468–469, 471–473, 475–477, 480, 481, 483–486, 491–494, and those violations enumerated 1 through 6 in plaintiffs' reply brief at p. 56.

11. These violations include the following: 146, 149, 150, 153, 160, 161, 165–67, 170, 175–77, 182, 185, 190, 191, 197, 200, 201, 204, 205, 208, 209, 222, 228–30, 246, 253, 261, 263, 285, 300, 303, 310, 329, 332, 340, 349, 353, 356–58, 361, 362, 365–67, 380, 381, 386, 387, 390–92, 395–96, 405, 408, 413, 414, 417–19, 422–24, 434, 437, 438,

441–43, 447–49, 452–454, 459, 462, 467, 470, 474, 478, 479, 482, 487, 488. In addition, plaintiffs document two worksheet violations of ph at 002, violations 234 and 237, which defendant does not include within its upstream monitoring defense discussed *infra*. The court will assume that the defendant concedes that these violations are not subject to any defense not already rejected and I will, therefore, grant partial summary judgment on those violations as well.

12. See Plaintiffs' Brief in Support of Motion for Partial Summary Judgment, Exhibit T.

in the record to support its contention that the worksheet is anything other than what it purports to be, an analysis of the effluent at 002. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("Rule 56(e) ... requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.")

The fact that defendant's continuous samples apparently did not reveal this violation is of no consequence. Defendant's permit required it to report all sampling done in excess of that specified in the permit. Permit, ¶ 12(b). Therefore, whether reported or not, each of these violations would have amounted to a violation of defendant's permit. Permit, ¶ 10(c) (defendant shall not discharge effluent with a ph above 9 or below 6). Plaintiffs' motion for summary judgment as to these six remaining violations will be granted.

■ Finally, defendant argues that it should be accorded "credit" for the periods of time that it achieved zero outfall at 002 at times when it could have discharged up to its permit limits. However, I catagorically reject defendant's position that times during which it did not violate the Act should be offset against the recorded violations for the obvious reason that, taken to its logical extreme, it would provide an absolute defense to all polluters except those who pollute more often than not. The Clean Water Act was designed to reach and eliminate all dischargers, not simply the worst offenders. It should not be construed by the parties, however, that the court is not sympathetic to defendant's "equitable" argument. The simple answer is that this court *will* consider fully whatever defendant's good-faith efforts at compliance have been, when they should be considered—at the penalty stage and not at the liability stage. *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir. 1979); *United States v. Amoco Oil Co.,* 580 F.Supp. 1042, 1050 (W.D.Mo.1984).

It is, therefore, concluded that defendant's motion to dismiss will be denied, its affirmative defenses rejected, and summary judgment entered as to all alleged violations. The court will enter an appropriate order.